[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-15352
Non-Argument Calendar
_____

D.C. Docket No. 1:12-cv-20935-DPG,
Bkcy No. 08-bkc-01710-AJC

In Re: PSN USA, INC.,

Debtor.
_____

PSN LIQUIDATING TRUST,

Plaintiff-Appellant,

versus

INTELSAT CORPORATION,
INTELSAT INTERNATIONAL SYSTEMS, LLC,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(September 4, 2015)

Before MARTIN, ROSENBAUM, and ANDERSON, Circuit Judges.

PER CURIAM:

PSN Liquidating Trust (the "Trust"), on behalf of the estate of PSN USA, Inc., (the "Debtor"), sought to void certain payments the Debtor made to appellees Intelsat Corporation and Intelsat International Systems, LLC, (collectively, "Intelsat"), contending that the Debtor did not receive "reasonably equivalent value" in exchange for the payments, *see* 11 U.S.C. § 548(a)(1)(B). The disputed transfers are payments the Debtor made to Intelsat under a contract between Intelsat and the Debtor's parent company, Pan American Sports Network International ("PSNI"). Based on stipulated facts, the bankruptcy court granted summary judgment in favor of Intelsat, concluding that the Debtor derived an economic benefit from the transfers because it received and used the services that were the subject of the contracts. The district court affirmed the bankruptcy court, and the Trust now appeals. We affirm.

**I.**

Before it filed for bankruptcy, the Debtor, PSN USA, Inc., was a Delaware corporation that operated the PSN Channel out of Miami Beach, Florida.[1] The PSN Channel was a cable television channel that broadcast live and recorded

---

[1] The following facts are taken primarily from a joint pretrial stipulation of facts prepared by the parties during proceedings before the bankruptcy court.

sporting events occurring throughout Latin America. PSNI, a "non-operating" holding company incorporated in the Cayman Islands, wholly-owned the Debtor.

The basic set-up for the PSN Channel's operation was as follows. PSNI acquired the rights to broadcast the sporting events and also contracted with providers of satellite services, like Intelsat. PSNI had no employees, was not authorized to do business in the United States, and had no role in producing or operating the PSN Channel. That role was filled by the Debtor, which, pursuant to a service contract with PSNI for which the Debtor derived a fee, provided all administrative, financial, corporate, marketing, and technical support services used in the production of the PSN Channel. At its production facilities in Miami Beach, the Debtor's employees bundled the sporting events for broadcast along with advertisements, commentary, and newscasts. The Debtor's employees then transmitted the PSN Channel via satellite to cable and satellite operators, who, in turn, offered and distributed the PSN Channel as part of cable packages to end subscribers throughout Central and South America and the Caribbean.

PSNI contracted with Intelsat to provide the satellite services necessary for the Debtor to produce and broadcast the PSN Channel. The Debtor was not a party to the contracts (the "Satellite Contracts"). Nonetheless, it was the general policy of the network for the Debtor to pay all production expenses, including the contractual obligations of PSNI when it related to production.

In line with this general policy, the Debtor made payments to Intelsat that were due under the Satellite Contracts from August 7, 2000, to January 8, 2002, which represents the period relevant to this case.[2]  During this period, the Debtor was undercapitalized and insolvent.  In total, the Debtor transferred over $3 million to Intelsat.[3]

In March 2002, the Debtor filed for bankruptcy under Chapter 11.[4]  Under the Debtor's First Amended Plan of Liquidation, which was confirmed by the bankruptcy court, the Trust was created and authorized to prosecute the Debtor's avoidance and recovery actions, including the present dispute.

In October 2008, the Trust filed an adversary complaint against Intelsat, alleging that the transfers to Intelsat under the Satellite Contracts should be returned to the Debtor's estate because they were constructively fraudulent under the federal Bankruptcy Code and corresponding Florida law.  According to the Trust, the Debtor did not receive "reasonably equivalent value," 11 U.S.C. § 548(a)(1)(B)(i), for the transfers on behalf of its corporate parent because the Debtor was not a party to the Satellite Contracts and so did not own the satellite

---

[2] The Debtor's payments do not appear to be limited to this period, however.

[3] The Trust contended that the Debtor made at least $1 million in additional payments, but the bankruptcy court did not resolve this factual dispute because its grant of summary judgment to Intelsat mooted the issue.  *See* Bankr. Doc. 117 at 3 n.3.

[4] Around the same time, PSNI initiated liquidation proceedings in the Cayman Islands. The parties do not suggest that these proceedings affect the instant case.

services or benefit from them.  The parties prepared a joint stipulation of facts and then filed cross-motions for summary judgment.

The bankruptcy court granted summary judgment in favor of Intelsat.  The court concluded that the Debtor received "reasonably equivalent value" for the transfers for two reasons:  (1) the Debtor received and used the satellite services; and (2) PSNI and the Debtor shared an identity of interests, such that any benefit PSNI received under the contract also indirectly benefited the Debtor.  The Trust appealed to the district court, 28 U.S.C. § 158(a), which affirmed.  The Trust now brings this appeal, which we have jurisdiction to review under 28 U.S.C. § 158(d).

## II.

As the second court of review in bankruptcy cases, we examine the judgment of the bankruptcy court independently of the district court.  *Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors (In re TOUSA, Inc.)*, 680 F.3d 1298, 1310 (11th Cir. 2012).  Generally, we review the bankruptcy court's findings of fact for clear error and its conclusions of law *de novo*.  *Id.* Whether "reasonably equivalent value" is given for a transfer ordinarily is a factual determination reviewed for clear error only.  *See id.* at 1311.  But because the bankruptcy court granted summary judgment based on stipulated facts, our review

5

is *de novo*.[5]  *See Gray v. Manklow (In re Optical Techs., Inc.)*, 246 F.3d 1332, 1335 (11th Cir. 2001) (whether summary judgment is properly granted is a question of law reviewed *de novo*).

## III.

Fraudulent transfer provisions like § 548 and the Florida Uniform Fraudulent Transfer Act ("FUFTA") are designed "to protect creditors against the depletion of a bankrupt's estate."  *Gen. Elec. Credit Corp. of Tenn. v. Murphy (In re Rodriguez)*, 895 F.2d 725, 727 (11th Cir. 1990).  These provisions operate to require a transferee to return certain transfers to the debtor's estate.  Transfers can be recovered either if they were made with the intent to defraud creditors, 11 U.S.C. § 548(a)(1)(A), or if they are constructively fraudulent, *id.* § 548(a)(1)(B).

Under the constructive-fraud provision, a transfer of the debtor's property, made within two years of the filing of the bankruptcy petition, can be avoided if the debtor "received less than a reasonably equivalent value in exchange for such transfer" and the debtor was insolvent at the time of transfer.  11 U.S.C. § 548(a)(1)(B)(i) & (ii)(I); *see* Fla. Stat. § 726.105(1)(b) (providing for avoidance where the debtor does not "receiv[e] a reasonably equivalent value in exchange for

---

[5] The Trust correctly notes that the district court erred in applying clear-error review to some of the bankruptcy court's determinations.  This error does not affect our review of this appeal because we independently review the judgment of the bankruptcy court. *In re TOUSA, Inc.*, 680 F.3d at 1310.

the transfer or obligation").[6]  Only the element of "reasonably equivalent value" is disputed in this case, and, within that element, "value" is the term under scrutiny. Section 548 defines "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor."  11 U.S.C. § 548(a)(2)(A); *see* Fla. Stat. § 726.104. "The burden of proving lack of 'reasonably equivalent value' under [§ 548] rests on the trustee challenging the transfer."  *Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.)*, 904 F.2d 588, 593-94 (11th Cir. 1990).

This case involves payments made by an insolvent subsidiary corporation (the Debtor), in place of its parent corporation (PSNI), under contracts between the parent corporation and a third entity (Intelsat).  "The general rule is that payment of or assumption of a third party's debt by an insolvent is a transfer without fair consideration and is thus fraudulent."  *Butz v. Sohigro Serv. Co. (In re Evans Potato Co. Inc.)*, 44 B.R. 191, 193 (S.D. Ohio 1984); *see Rubin v. Mfrs. Hanover Trust Co.*, 661 F.2d 979, 991 (2d Cir. 1981) (concerning the analogous former fraudulent transfer provision under 11 U.S.C. § 107(d)).

But an insolvent debtor's payment on behalf of a third party is not avoidable if the transfer "confers an economic benefit upon the debtor, either directly or

---

[6] Because the Florida constructive fraudulent transfer statutes are "analogous in form and substance" to § 548(a)(1)(B) of the Bankruptcy Code, "[t]he test common to the Bankruptcy Code and each of the Florida statutes is whether the debtor received reasonably equivalent value in exchange for the obligation or transfers."  *Official Comm. of Unsecured Creditors v. Florida (In re Tower Envtl., Inc.)*, 260 B.R. 213, 222 (Bankr. M.D. Fla. 1998) (internal quotation marks omitted).

indirectly." *In re Rodriguez*, 895 F.2d at 727 (quoting *Rubin*, 661 F.2d at 991). "In such a situation, the debtor's net worth has been preserved, and the interests of the creditors will not have been injured by the transfer." *Id.* (internal quotation marks omitted); *see Frontier Bank v. Brown (In re N. Merch., Inc.)*, 371 F.3d 1056, 1059 (9th Cir. 2004) ("[T]he primary focus of Section 548 is on the net effect of the transaction on the debtor's estate and the funds available to the unsecured creditors.").

## A.

The bankruptcy court held that reasonably equivalent value was given for the payments to Intelsat because "the Debtor received and used the satellites services and transponder capacity provided by Intelsat under the Satellite Contracts." Bankr. Doc. 117 at 7. The court elaborated as follows:

> The Debtor operated the PSN Channel, the satellite services provided by Intelsat were necessary and critical to the broadcast of the PSN Channel, and the Debtor's employees performed all of the functions necessary to transmit programming on the PSN Channel to Intelsat's satellites. On the other hand, PSNI was a non-operating company, with no employees and was not authorized to conduct any business in the United States, where all of the operations of the PSN Channel took place. The Debtor thus received and used Intelsat's satellite services; PSNI could not and did not. Absent the services provided by Intelsat, the Debtor would not have been able to distribute its programming to the cable television system operators that were its customers. Furthermore, the Trust does not dispute that the value of the satellite services were reasonably equivalent to the Transfers.

*Id.* (footnotes omitted).

Apart from the Debtor's receipt and use of the satellite services, the bankruptcy court also determined that the Debtor received reasonably equivalent value because it and PSNI shared an "identity of interests" as a "single enterprise," such that any benefit to PSNI indirectly benefited the Debtor.

When an appeal was brought to the district court, the district judge, after holding a hearing, likewise concluded that the Debtor "received reasonably equivalent value in exchange for the payments made to Intelsat, because [the Debtor] received and used the satellite services provide[d] by Intelsat, absent which [the Debtor] would not have any business to operate." Dist. Doc. 41 at 5. In addition, the court added, "[the Debtor] received indirect benefits as well as a result of the payments it received from PSNI for operating the PSN Channel." *Id.* The district court also affirmed the bankruptcy court's conclusion that the Debtor shared an "identity of interests" with PSNI.

**B.**

The Trust contends that both the bankruptcy court and the district court erred in applying an impermissibly broad definition of what constitutes value under § 548. Because the term "value" is defined as "property" under the Bankruptcy Code, the Trust reasons, value is not received unless property is received. And because the term "property" is not defined in the federal Bankruptcy Code, the

9

Trust asserts that we should apply the FUFTA's definition of property—"anything that may be the subject of ownership"—to fill the gaps in the federal statute.  *See* Fla. Stat. § 726.102(10).

Altogether, according to the Trust, these propositions lead to the conclusion that value under § 548 is not received in exchange for a transfer unless the transferor "obtained some kind of enforceable entitlement to some tangible or intangible article."  *Official Comm. of Unsecured Creditors of TOUSA, Inc. v. Citicorp N. Am., Inc. (In re TOUSA, Inc.)*, 422 B.R. 783, 868 n.55 (Bankr. S.D. Fla. 2009) ("*TOUSA* Bankruptcy Court Decision").[7]  As applied in this case, the Trust's position is that, because the Debtor was not a party to the Satellite Contracts, the Debtor did not receive an enforceable entitlement to the satellite services—but instead was using the services solely for PSNI's benefit—and therefore did not receive value for purposes of § 548.

---

[7] On appeal from the bankruptcy court, the district court in *In re TOUSA, Inc.* quashed the bankruptcy court's order, concluding that the "dictionary definition" of "value" put forth by the bankruptcy court was too narrow and was contrary to the purposes of the Bankruptcy Code. *3V Capital Master Fund Ltd. v. Official Comm. of Unsecured Creditors of TOUSA, Inc. (In re TOUSA Inc.)*, 444 B.R. 613, 655-56 (S.D. Fla. 2011) ("*TOUSA* District Court Decision"). According to the *TOUSA* District Court Decision, "the weight of authority supports the view that indirect, intangible, economic benefits, including the opportunity to avoid default, to facilitate the enterprise's rehabilitation, and to avoid bankruptcy, even if it proved to be short lived, may be considered in determining reasonable equivalent value." *Id.* at 660.  When the case made its way to this Court, we found it unnecessary to "adopt the definition of either court," and we "decline[d] to decide whether the possible avoidance of bankruptcy can confer 'value' because the bankruptcy court found that, even if all the purported benefits of the transaction were legally cognizable, they did not confer reasonably equivalent value." *In re TOUSA, Inc.*, 680 F.3d at 1311.

Under the proper definition of "value," the Trust asserts, the Debtor did not receive value for three reasons:  (1) the Debtor did not receive anything that may be the subject of ownership;  (2) the Debtor did not receive anything that preserved its net worth;  and (3) the Debtor did not receive or use the satellite services for its own benefit.[8]

## IV.

We agree with the bankruptcy court and district court that the Debtor received reasonably equivalent value in exchange for the transfers to Intelsat. Therefore, we affirm.

"Courts generally construe the term 'value' broadly for purposes of the Bankruptcy Code." *Templeton v. O'Cheskey (In re Am. Hous. Found.)*, 785 F.3d 143, 163 (5th Cir. 2015); *see Pension Transfer Corp. v. Beneficiaries Under the Third Amendment to Fruehauf Trailer Corp. Ret. Plan No. 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 212 (3d Cir. 2006) ("We have interpreted 'value' to include any benefit, . . . whether direct or indirect . . . .  [T]he mere opportunity to receive an economic benefit in the future constitutes 'value' under the [Bankruptcy] Code." (internal citation, quotation marks, and brackets omitted)); *Butler Aviation Int'l, Inc. v. Whyte (In re Fairchild Aircraft Corp.)*, 6 F.3d 1119,

---

[8] In addition, the Trust asserts that the bankruptcy court improperly adopted verbatim Intelsat's proposed opinion.  We have admonished lower courts not to adopt verbatim important opinions or orders drafted by litigants.  *Chudasama v. Mazda*, 123 F.3d 1356, 1373 n.46 (11th Cir. 1997).  Nonetheless, the Trust does not ask for any specific relief on this basis, and any impropriety is harmless under the circumstances because our review is *de novo*.

11

1127 (5th Cir. 1993) ("Courts have considered such indirect financial effects as, for example, the synergy realized from joining two enterprises, the increase in a credit line, and the increased monetary 'float' resulting from guarantying the loans of another, as constituting value received under § 548." (footnotes omitted)).

In keeping with this broad understanding of value, the test that courts have applied to determine "reasonably equivalent value" is whether the transfer "confers an economic benefit upon the debtor, either directly or indirectly," *In re Rodriguez*, 895 F.2d at 727 (quoting *Rubin*, 661 F.2d at 991), not whether the debtor received property rights by virtue of a transfer or whether the debtor was a party to the contract at issue. *See, e.g.*, *In re Fairchild Aircraft Corp.*, 6 F.3d at 1127 ("According to Whyte, the only value that can be considered is property actually received. . . . The narrow 'realized property' approach to value advanced by Whyte finds no approbation in the law. Rather, the recognized test is whether the investment conferred an economic benefit on the debtor." (citing *Rodriguez*, 895 F.2d at 727)); *cf. In re N. Merch., Inc.*, 371 F.3d 1056, 1059 (9th Cir. 2004) ("Although Debtor was not a party to the October loan, it clearly received a benefit from that loan."). This Court has held that the rendition of a service can constitute value under § 548, *see Orlick v. Kzyak (In re Fin. Federated Title & Trust, Inc.)*, 309 F.3d 1325, 1332-33 (11th Cir. 2002) (remanding for consideration of the value of services an individual provided to a company operating a Ponzi scheme), and

we have also indicated that something in which it is impossible to assert property rights may be a "valuable benefit: time," *Crumpton v. Stephens (In re Northlake Foods, Inc.)*, 715 F.3d 1251, 1256 (11th Cir. 2013).   Other than the *TOUSA* Bankruptcy Court Decision, the Trust has not identified any persuasive case law that supports its narrower formulation.[9]

In any case, we need not issue any definitive statement on the term "value" in this case because our opinion in *In re Rodriguez* is persuasive in these circumstances.   In *In re Rodriguez*, we addressed whether a holding company received reasonably equivalent value in exchange for payments it made to service the debt of a subsidiary.  *In re Rodriguez* 895 F.2d at 726.   The subsidiary's only asset was a jet aircraft, which was financed with a loan from the eventual transferee of the disputed transfers.  *Id.*  The subsidiary made payments on the loan for two years, but, thereafter, the holding company took over and began making payments, although it had no obligation to do so.  *Id.*   After ten months, the holding company stopped paying and allowed the subsidiary to default on the loan.

---

[9] The Trust cites two unpublished district court decisions from the Northern District of Texas and the Eastern District of Wisconsin, respectively, as well as a dissenting opinion from the Supreme Court of Alabama.  *Alexander v. Holden Bus. Forms, Inc.*, No. 4:08-cv-614, 2009 WL 2176582, at *6 (N.D. Tex. July 20, 2009); *McCloskey v. Wells Fargo Bank Wisc., NA (In re Art Unlimited, LLC)*, No. 07-c-54, 2007 WL 2670307, at *9-10 (E.D. Wisc. Sept. 6, 2007); *Alabama National Red Cross v. ASD Specialty Healthcare, Inc.,* 888 So. 2d 464, 469 (Ala. 2003) (Lyons, J., dissenting)(stating that there is a "difference between a service contract and the actual rendition of a service. The former is property that can be the subject of ownership, while the latter is not").   However, these cases are not persuasive because they do not involve the issue of whether the debtor received "reasonably equivalent value."

13

*Id.* After the holding company filed for bankruptcy, its trustee sought to recover payments made toward the jet loan on that theory that the holding company had not received reasonably equivalent value in exchange. *Id.* at 727. The bankruptcy court and the district court agreed. *Id.* On appeal to this Court, the transferee argued, among other things, that the holding company had indirectly benefited from the loan payments.

In rejecting the transferee's position, we found that two economic benefits were associated with the holding company's loan payments: (1) a reduction in the subsidiary's indebtedness; and (2) continued use of the jet. *See id.* at 728. We explained that "[o]nly if [the holding company] shared in the enjoyment of either of these benefits can the payments have conferred an 'economic benefit' upon [the holding company] such that its net worth was preserved by the payments." *Id.* With respect to the first benefit, the holding company received no advantage from a reduction in its subsidiary's debt because a corporation is not liable for the debts of its subsidiary. *Id.* As to the second benefit, the holding company did not, and could not, have benefited from use of the plane itself because it was non-operative. *Id.* We further noted that, unlike the debtor in *In re Evans Potato Co.*, where the "court found that the debtor had received reasonably equivalent value for its payments because it made use of the goods," the holding company in *In re*

*Rodriguez* "was unable to use the product [the jet] for which it paid." *Id.* at 728 n.5.

Thus, *In re Rodriguez* recognizes that a party may receive an "economic benefit" for purposes of determining "reasonably equivalent value" if it "share[s] in the enjoyment of" or "use[s]" a good or service. 895 F.2d at 728. In contrast to the debtor in *In re Rodriguez*, the Debtor in this case was able to use the satellite services for which it paid, despite the fact that it was not obligated on the Satellite Contracts. *See id.* & n.5. In exchange for its payments, the Debtor received from Intelsat the satellite services that were necessary for the Debtor's business of operating the PSN Channel. For operating the PSN Channel, the Debtor earned a service fee from its parent company, PSNI. As a non-operating holding company, like the holding-company debtor in *In re Rodriguez*, PSNI could not have used the satellite services. Moreover, the Trust does not dispute that the satellite services constitute "property," even under their proposed definition of the term[10], that the Debtor received and used these services (although the Trust does dispute which entity received the benefit of the Debtor's use of those services), or that the payments to Intelsat were reasonably equivalent in value to the satellite services.

---

[10] For that reason, as the district court pointed out, and despite the Trust's attempts to equate them in proceedings below, the satellite services at issue clearly are not equivalent to love or affection or other concepts that are not recognized as having value under the Bankruptcy Code. *See Walker v. Treadwell (In re Treadwell)*, 699 F.2d 1050, 1051 (11th Cir. 1983) (holding that "love and affection" are inadequate consideration to be reasonably equivalent value for a transfer). The satellite services in this case are concrete and quantifiable.

15

Despite these undisputed facts, the Trust argues that the Debtor's receipt and use of the satellite services, and its operation of the PSN Channel more generally, were solely for the benefit of PSNI.  The Debtor, the Trust asserts, did not receive at least $3 million so as to preserve its net worth, and staying in business ultimately worsened the Debtor's condition and made its creditors worse off.

As an initial matter, "[t]he concept of reasonably equivalent value does not require a dollar-for-dollar transaction."  *In re Northlake Foods, Inc.*, 715 F.3d at 1257.  The value received needs only be "reasonably equivalent" in value to what was transferred.  *See* 11 U.S.C. § 548(a)(1)(B).

Moreover, the fact the Debtor ultimately landed in bankruptcy does not preclude a finding that value was not given, even if the value increased the debtor's insolvency.  *See In re Fin. Federated Title & Trust, Inc.*, 309 F.3d at 1332.  "[A] determination of whether value was given under [§] 548 should focus on the value of the goods and services provided rather than on the impact that the goods and services had on the bankrupt enterprise."  *Id.* (approving and quoting *Merrill v. Allen (In re Universal Clearing House Co.)*, 60 B.R. 985, 1000 (D. Utah 1986)).  And the question of whether reasonably equivalent value is given "has to be analyzed . . . from the perspective of whether and when value was created and exchanged."  *Pummill v. Greensfelder, Hemker & Gale (In re Richards & Conover Steel, Co.)*, 267 B.R. 602, 613 (B.A.P. 8th Cir. 2001); *cf. In re TOUSA, Inc.*, 680

16

F.3d at 1313 (stating that the question for purposes of assessing reasonably equivalent value was, "based on the circumstances that existed at the time the investment was contemplated, whether there was any chance that the investment would generate a positive return" (quoting *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 151-52 (3d Cir. 1996)); *Jimmy Swaggart Ministries v. Hayes (In re Hannover Corp.)*, 310 F.3d 796, 802 (5th Cir. 2002) ("Thus, consistent with economic reality, this and other circuits unequivocally hold that for purposes of § 548 the value of an investment, even a risky one, such as we have before us now, is to be determined at the time of purchase."). Here, there is nothing to indicate that the Debtor did not receive and use the full value of the satellite services Intelsat provided.

The Trust's contention that, even though the Debtor technically received and used the satellite services, it did not do so for its own benefit because it was merely managing the satellite services for PSNI's benefit, as a factory manager would operate a factory for its owner's benefit, is unconvincing.[11] In arguing this ground, the Trust's own assertions belie any claim that it did not benefit economically from its payments to Intelsat under the Satellite Contracts. The Trust expressly admits

---

[11] The Trust attempts to have it both ways with respect to the Debtor's relationship to its parent company, PSNI. On the one hand, the Trust asserts that the Debtor is a distinct company that must be analyzed separately in determining whether it received reasonably equivalent value. On the other hand, the Trust's "factory manager" analogy and its assertion that it received no benefit whatsoever from operating the PSN Channel suggests that the Debtor, while legally distinct from PSNI, was functionally as a single enterprise along with PSNI.

17

that it received payments from PSNI under a service contract for its operation of the PSN Channel. Appellant's Initial Br. at 32 ("In return for providing those services [operating the channel], [the Debtor] earned a service fee from PSNI."); Appellant's Reply Br. at 7 ("Although [the Debtor] received and used the satellite services to broadcast the PSN Channel, it is undisputed that [the Debtor] did so for *PSNI's benefit pursuant to a service contract and in exchange for an annual service fee*." (emphasis in original)). Consequently, even if the Debtor did not directly benefit from Intelsat, the evidence shows that the Debtor indirectly benefited from PSNI by using the services it received from Intelsat. *See Rubin*, 661 F.2d at 991 ("If the consideration given to the third person has ultimately landed in the debtor's hands, or if the giving of the consideration to the third person otherwise confers an economic benefit upon the debtor, then the debtor's net worth has been preserved . . . .").

## V.

In sum, we affirm the bankruptcy court's ruling that the Trust cannot avoid the transfers the Debtor made to Intelsat under the Satellite Contracts because the Debtor received reasonably equivalent value in exchange for the transfers.

**AFFIRMED.**

18