In the MATTER OF: SOUTHERN HOME AND RANCH SUPPLY, INC., Debtor.

Griffin E. Howell, III, Plaintiff,

v.

James Fulford and Srh Holding Company, LLC, Defendants.

CASE NUMBER 11–12755–WHD ADVERSARY PROCEEDING NO. 13–1043–WHD

United States Bankruptcy Court, N.D. Georgia, Newnan Division.

Signed December 28, 2016

Jonathan A Akins, John A. Christy, Kelly L. Walsh, Schreeder, Wheeler & Flint, LLP, Atlanta, GA, for Plaintiff.

J. Nevin Smith, Smith Conerly LLP, Carrollton, GA, for Defendants.

## ORDER

W. Homer Drake, U.S. Bankruptcy Court Judge

■ Before the Court is the Complaint of Griffin E. Howell, III (hereinafter the "Trustee"), trustee for the Bankruptcy estate of Southern Home and Ranch Supply, Inc. (hereinafter the "Debtor"). The Trustee's complaint seeks to avoid as fraudulent a transfer of assets made by the Debtor to SRH Holding Company, LLC (hereinafter "SRH"). This is a core proceeding over which this Court has subject matter jurisdiction. 28 U.S.C. §§ 157(a), (b)(2)(H), 1334.[1]

---

1. The Court is aware that, despite the enumeration of fraudulent conveyance actions as "core proceedings," there may be a question concerning its authority to enter final judgment in such actions. *See Exec. Benefits Ins. Agency v. Arkison (In re Bellingham Ins. Agen-* cy, Inc.), 702 F.3d 553, 561 (9th Cir. 2012) ("*Granfinanciera S.A. v. Nordberg* and *Stern v. Marshall*...point ineluctably to the conclusion that fraudulent conveyance claims...cannot be adjudicated by non-Article III judges."). In this proceeding, the par-

This proceeding came on for trial on November 29, 2016. After hearing the evidence and the arguments of the parties, the Court concludes as set forth below.

## Findings of Fact

The Debtor operated construction supply and hardware stores in northern Georgia. Defendant James Fulford (hereinafter "Fulford") owned 25% of the Debtor and was on its board of directors.

In 2007, the Debtor began experiencing financial distress. In an effort to keep the business going, Fulford made three loans to the Debtor over the course of about a year: $350,000 in March of 2008, $500,000 in December of 2008, and $500,000 in February of 2009. On March 1, 2009, the Debtor executed a promissory note consolidating the three loans into one loan for $1,350,000 (hereinafter the "Consolidated Note"). The Debtor also executed a security agreement granting Fulford a security interest in all of the Debtor's assets. The Consolidated Note provided that the debt would be paid at 6% interest, and had a maturity date of March 1, 2010. A financing statement perfecting Fulford's interest was filed on August 12, 2009. A senior lien held by BB & T also encumbered the Debtor's assets.

ties have expressed that they have no opposition to the Court's exercise of jurisdiction over this matter. (*See* Amended Consolidated Pretrial Order, Doc. No. 70, at ¶ 4 ("No questions exist as to jurisdiction."); *see also* Answer, Doc. No. 44, at ¶ 1 ("Defendants do not contest this Court's jurisdiction over this matter.")). As the Court finds that the parties have consented to its jurisdiction, it need not address further its authority to resolve this proceeding. See *Wellness Int'l Network, Ltd. v. Sharif*, —— U.S. ——, 135 S.Ct. 1932, 1949, 191 L.Ed.2d 911 (2015) ("Article III permits bankruptcy courts to decide *Stern* claims submitted to them by consent.").

Despite the injections of cash from Fulford, the Debtor's business did not improve. A director and shareholder testified at the trial that 2010 was "the bottom of the bottom" for the construction industry, causing the Debtor to struggle. That year, the Debtor closed one of its stores and liquidated inventory to generate cash. The director also testified that the liquidation value of the Debtor's inventory during good economic times was $.20 to $.60 on the dollar, but in 2010, the Debtor was getting whatever it could. During this decline, the Debtor made some interest payments on the Consolidated Note.

On June 9, 2010, Fulford formed SRH as a Georgia limited liability company, with himself as the sole member. On June 30, 2010, Fulford assigned his interest in the Consolidated Note and the related security agreement to SRH. That same day, SRH and the Debtor entered into an Agreement for Voluntary Surrender of Collateral and Consent to Proposal to Accept Collateral in Full Satisfaction of Obligation (hereinafter the "Agreement"). The Agreement called for the Debtor to surrender all of its assets (the collateral securing the Consolidated Note) in exchange for the full satisfaction of the debt owed to SRH, which at the time consisted of the entire principal balance of $1,350,000, plus approximately $30,000 in unpaid interest.[2] In addition,

2. At trial, neither party presented clear evidence of the amount of interest owed on the date of the transfer. However, the Consolidated Note provided that interest would accrue at 6% per year. (Plaintiff's Exh. 4). In addition, the Defendants entered exhibits showing that the Debtor had paid $73,742.46 to Fulford between April 2009 and January 2010 as interest payments on the Consolidated Note and on the individual notes that had preceded it. (Defendant's Exhs. 17, 19–27). Using these numbers, the Court concludes that at the time of the transfer approximately $30,000 in interest remained outstanding. The Court couches its conclusion as an approximation because no evidence was admitted as to what amounts of the interest payments were direct-

Fulford paid BB & T the outstanding balance on its loan to the Debtor, $1,281,347.38, in order to satisfy BB & T's claim to the collateral. Fulford also testified that he paid off his brother, who held a junior lien on the collateral. After the transfer, the Debtor ceased operating. On August 18, 2011, the Debtor filed a bankruptcy petition under Chapter 7 of the Code.

## Conclusions of Law

On August 16, 2013, the Trustee filed the instant adversary proceeding seeking to avoid the transfer of the Debtor's assets to SRH. The Trustee's complaint (as amended on September 9, 2014) contains three counts: (I) Fraudulent Conveyance Pursuant to 11 U.S.C. § 548(a)(1)(A) and O.C.G.A. § 18–2–74(a)(1); (II) Fraudulent Conveyance Pursuant to 11 U.S.C. § 548(a)(1)(B) and O.C.G.A. § 18–2–74(a)(2); and (III) Attorneys' Fees Pursuant to O.C.G.A. § 13–6–11.

### A. Counts I & II: Fraudulent Conveyance

■ Section 548 of the Bankruptcy Code and § 18–2–74 of the Georgia Code [3] allow a trustee to avoid transfers made by a debtor within statutory periods if those transfers are made with actual or constructive fraudulent intent. See 11 U.S.C. § 548; O.C.G.A. §§ 18-2-74(a), -79. In the instant proceeding, there is no dispute that the Debtor transferred property to SRH via the Agreement within the statutory periods. Thus, the sole issue for the Court to resolve is whether the Debtor acted with fraudulent intent when it transferred those assets. On that question, under both the Bankruptcy Code and the Georgia Code, the Trustee bears the burden of

proof by a preponderance of the evidence. See O.C.G.A. § 18–2–74(d); *PSN Liquidating Trust v. Intelsat Corp. (In re PSN USA, Inc.)*, 615 Fed.Appx. 925, 928 (11th Cir. 2015) (per curiam); *Pettie v. Ringo (In re White)*, 559 B.R. 787, 795–96 (2016) (Hagenau, J.); *Mann v. Brown (In re Knight)*, 473 B.R. 847, 849 (Bankr. N.D. Ga. 2012) (Drake, J.).

### 1. Constructive Fraud

Under both the Bankruptcy Code and the Georgia Code, a transfer is constructively fraudulent, and therefore avoidable, if: (1) the debtor did not receive reasonably equivalent value in exchange for the transfer; and (2) at least one other condition is met (for example, the transfer rendered the debtor insolvent). See 11 U.S.C. § 548(a)(1)(B); O.C.G.A. § 18-2-74(a)(2). Though the statutes differ slightly as to what may constitute the "other condition," *compare* 11 U.S.C. § 548(a)(1)(B)(ii) (providing four alternatives, including insolvency), *with* O.C.G.A. § 18-2-74(a)(2) (providing only two alternatives), they both begin with the threshold requirement that the transfer was not in exchange for reasonably equivalent value, *see* 11 U.S.C. § 548(a)(1)(B)(i); O.C.G.A. § 18-2-74(a)(2); *see also Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors (In re TOUSA, Inc.)*, 680 F.3d 1298, 1311 (11th Cir. 2012) ("The purpose of voiding transfers unsupported by 'reasonably equivalent value' is to protect creditors against the depletion of a bankrupt's estate." (quoting *Gen. Electric Credit Corp. of Tenn. v. Murphy (In re Rodriguez)*, 895 F.2d 725, 727 (11th Cir. 1990))). Therefore, the first issue for this Court is whether the Debtor received reasonably

---

ed to the consolidated loan and which were paid toward the previous loans.

3. A trustee may use state law to void transfers by operation of the provisions of § 544 of the Bankruptcy Code. See 11 U.S.C. § 544(b)(1).

equivalent value in exchange for the transfer.

This Court has previously broken down the inquiry into a three-part test: "1) whether the debtor received value; 2) whether the value received was in exchange for the property transferred; and 3) whether the value was reasonably equivalent to the value of the property transferred." *In re Knight*, 473 B.R. at 850.

### a. Whether the debtor received value.

A debtor receives "value" if he receives "property, or satisfaction or securing of a present or antecedent debt of the debtor." 11 U.S.C. § 548(d)(2)(A); *see also* O.C.G.A. § 18-2-73(a) ("Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied...."). Here, because the Debtor received forgiveness of the debt owed under the Consolidated Note and the debt owed to BB & T, the Debtor received "value."

### b. Whether the value received was in exchange for the property transferred.

"[A] transfer is in exchange for value if one is the quid pro quo of the other." *In re Knight*, 473 B.R. at 850 (quoting *Kaler v. Able Debt Settlement, Inc. (In re Kendall)*, 440 B.R. 526, 532 (8th Cir. BAP 2010)). Here, the Agreement clearly shows that the Debtor received the satisfaction of the debt owed under the Consolidated Note in exchange for the transfer of the Debtor's assets to SRH. However, the Court does not find that the forgiveness of the debt owed to BB & T was received *in exchange* for the transfer of the assets because the Agreement, by which the transfer was effected, does not mention the loan to BB & T at all. Therefore, the Court concludes that Fulford's

payment of $1,281,347.38 to BB & T was simply meant to provide SRH, his holding company, with clear title. It was not part of the quid for the Debtor's quo. *See quid pro quo*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("An action or thing that is exchanged for another action or thing of more or less equal value; a substitute...."). Thus, though the Debtor certainly received "value" from the payoff of the debt owed to BB & T, only the forgiveness of the debt owed to SRH was received in exchange for the transfer of the Debtor's assets.

### c. Whether the value was reasonably equivalent to the value of the property transferred.

Whether a debtor received reasonably equivalent value in exchange for a transfer is a factual determination that requires consideration of the totality of the circumstances. *See Anderson v. Patel (In re Diplomat Constr., Inc.)*, 2013 WL 5591918, at *5 (Bankr. N.D. Ga. Aug. 6, 2013) (Diehl, J.); *In re Knight*, 473 B.R. at 851 (noting that a court should examine "all aspects of the transaction and carefully [measure] the value of all benefits and burdens to the debtor" (quoting *Pummill v. Greensfelder, Hemker & Gale (In re Richards & Conover Steel, Co.)*, 267 B.R. 602, 612 (8th Cir. BAP 2001))). Value can be "reasonably equivalent" without involving a dollar-for-dollar exchange. *Advanced Telecomm. Network, Inc. v. Allen (In re Advanced Telecomm. Network, Inc.)*, 490 F.3d 1325, 1336 (11th Cir. 2007); *see also In re Knight*, 473 B.R. at 852 ("The Court is inclined to hold that...the satisfaction of a $49,000 debt by transferring an interest in property worth $65,000 constitutes a reasonably equivalent exchange."). "The Court need only ensure that 'the debtor received a fair exchange,' after examining 'all aspects of the transaction and carefully

[measuring] the value of all benefits and burdens to the debtor. . . .'" *In re Knight,* 473 B.R. at 851 (internal quotation marks omitted) (alteration in original) (quoting *In re Richards and Conover Steel, Co.,* 267 B.R. at 612). Values are determined as of the time of the transfer. *In re White,* 559 B.R. at 801–02.

■ In the instant proceeding, the debt owed on the Consolidated Note was $1,350,000 plus approximately $30,000 in interest. Therefore, the issue is whether the value of the Debtor's assets at the time of the transfer was reasonably equivalent to approximately $1,380,000.

To show that the Debtor's assets had a vastly greater value than the debt forgiven, the Trustee relied on the Debtor's 2010 tax return, particularly the Debtor's 2010 balance sheet. The balance sheet, which reflects the Debtor's financial situation on January 1, 2010, shows that the Debtor's assets were worth $3,302,658. This included $2,011,440 worth of inventory, $305,277 in accounts receivable (less $20,165 as an allowance for "bad debts"), $133,510 in investments, and $654,309 in depreciable assets (vehicles, furniture, equipment, etc.). In the course of the trial, the Trustee called as a witness the accountant who prepared the tax return. The accountant testified that she used "book values" in completing the balance sheet and the related depreciation schedule. This meant that the value given for the inventory was the amount the Debtor paid to acquire the inventory, the value given for the accounts receivable was the actual amount owed, and the value given for the depreciable assets was the assets' value, less the depreciation. Though these numbers represented the book values of the Debtor's assets nearly seven months before the transfer took place, the Trustee argued that these were conservative valuations, and therefore the Debtor's assets were

worth at least the $3,302,658 listed on the balance sheet.

For their part, the Defendants presented the testimony of Patrick Malloy, a shareholder and director of the Debtor. Malloy testified that the company started experiencing financial trouble in 2007, and that it borrowed money from Fulford to maintain cash flow. Malloy described how the Debtor's situation, which he termed "hopeless," had not improved by 2010. While the Debtor had been liquidating its inventory, Malloy testified that most of the inventory was consumer hardware goods unpackaged for sale in the Debtor's stores, and the liquidation value was not as high as it would have been if the inventory were still in bulk form. Based on his understanding of the business and the value of the Debtor's assets, Malloy testified that the offer to accept the collateral in forgiveness of the loan was "generous." He concluded that the value of the Debtor's assets was significantly less than the $1.35 million owed in principal to SRH, and that liquidating the Debtor would not have produced even enough to pay off the $1,281,347.38 owed to BB & T.

Having weighed and considered the evidence presented by the parties, the Court concludes that the Trustee has failed to show by a preponderance of the evidence that the Debtor did not receive reasonably equivalent value in exchange for the transfer. The Court does so primarily because the Trustee has failed to present convincing evidence that the values in the Debtor's balance sheet reflected the value of the Debtor's assets on June 30, 2010. Though the balance sheet does suggest that the Debtor's assets were worth well more than the debt owed to SRH, the information the balance sheet contains was nearly seven months old at the time of the transfer. The testimony at trial suggested that the spring of 2010 was a time of

considerable upheaval for the Debtor, and that at the time of the transfer its assets were worth much less than the values given in the balance sheet. Based on that testimony and the limited evidence of value at the time of the transfer presented by the Trustee, the Court finds that is not "more likely than not" that the value of the Debtor's assets did not drop precipitously in the course of closing a store and liquidating inventory in the midst of a downturn for the industry the Debtor serviced.

In light of these considerations, the Trustee has failed to convince the Court that, more likely than not, the value of the Debtor's assets was not reasonably equivalent to the amount of the debt forgiven. Therefore, as reasonably equivalent value is an essential element of a constructive fraud claim under both the Bankruptcy Code and the Georgia Code, the Court will enter judgment for the Defendants on Count II of the Trustee's complaint.

### 2. Actual Fraud

 The Court's conclusion concerning constructive fraud does not preclude it from finding that the Debtor's transfer is avoidable as actually fraudulent. Section 548(a)(1)(A) of the Bankruptcy Code and § 18–2–74(a)(1) of the Georgia Code both allow a trustee to avoid a transfer if it was made "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became...indebted." 11 U.S.C. § 548(a)(1)(A); *see also* O.C.G.A. § 18–2–74(a)(1) (using substantially the same language). "Because proof of 'actual intent to hinder, delay, or defraud' creditors...may rarely be accomplished by direct proof," a court may consider the situation surrounding the transfer and "infer fraudulent conduct from the circumstantial evidence." *Dionne v. Keating (In re XYZ Options, Inc.)*, 154 F.3d 1262, 1271 (11th Cir. 1998); *accord Official Comm. of Unsecured Cred-itors v. Liberty Savings Bank, FSB (In re Toy King Distributors, Inc.)*, 256 B.R. 1, 127–28 (Bankr. M.D. Fla. 2000).

 To evaluate the circumstances surrounding an allegedly fraudulent transfer and determine whether fraudulent intent may be inferred, the Eleventh Circuit has directed that "[a] court should investigate the transfer for the existence of badges of fraud." *In re XYZ Options, Inc.*, 154 F.3d at 1271. In enumerating these "badges of fraud," the Eleventh Circuit relied on a state fraudulent conveyance statute. *Id.* at 1272 (quoting Ala. Code § 8–9A–4(b)). Thus, this Court will refer to the nonexclusive list of factors given in the Georgia Code. *See* O.C.G.A. § 18–2–74(b). Those factors are as follows:

(1) The transfer or obligation was to an insider;

(2) The debtor retained possession or control of the property transferred after the transfer;

(3) The transfer or obligation was disclosed or concealed;

(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) The transfer was of substantially all the debtor's assets;

(6) The debtor absconded;

(7) The debtor removed or concealed assets;

(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*Id.*; *see also Bloom v. Camp*, 336 Ga.App. 891, 785 S.E.2d 573, 577–78 (2016). While "[t]he presence of a single badge of fraud may spur mere suspicion, the confluence of several can constitute conclusive evidence of an actual intent to defraud...." *In re Toy King Distributors, Inc.*, 256 B.R. at 128 (internal quotation marks omitted) (alteration in original) (quoting *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1254–55 (1st Cir. 1991)); *see also Sheppard v. Broome*, 214 Ga. 659, 107 S.E.2d 219, 223 (1959) ("[B]adges of fraud are circumstances, signs, marks, suspicions, not of themselves sufficient to authorize a finding, unless more than one [are] combined."). Particularly worthy of consideration is the first badge of fraud: whether the transfer was to an insider. *See In re Toy King Distributors*, 256 B.R. at 128–29.

■ Several badges of fraud are present in the instant proceeding: the transfer was to an insider [4]; the transfer was of all of the Debtor's assets; and the transfer rendered the Debtor insolvent. These facts, particularly the transfer to an insider, all suggest that the transfer was made with actual intent to defraud the Debtor's creditors.

However, there was also evidence presented at the trial that militates against such a conclusion. Malloy, the shareholder and director of the Debtor, testified that he believed the transfer was a good business decision in light of the Debtor's financial situation. The evidence also shows that over a year elapsed between the execution of the Consolidated Note and security agreement and the Debtor's transfer of the assets to SRH. These facts intimate that despite the fact that SRH is an insider of the Debtor, this was not a scheme to transfer the value of the Debtor out of the reach of creditors, but, on the contrary, was the outcome of an attempt to salvage a failing enterprise. Additionally, though the Trustee argues that the transfer was also tainted by a lack of equivalent value, the Court has already determined that the Trustee did not carry his burden on that point.

Faced with these competing considerations, the Court is once again not convinced that, more likely than not, the Debtor acted fraudulently. Thus, the Trustee has failed to carry his burden on Count I of his complaint, and the Court will enter judgment for the Defendants.

## B. Count III: Attorneys' Fees

■ The Trustee's third count is a request for attorneys' fees pursuant to O.C.G.A. § 13-6-11. That statute allows

---

4. When the debtor is a corporation, the Bankruptcy Code defines an insider to include an "affiliate, or an insider of an affiliate as if such affiliate were the debtor." 11 U.S.C. § 101(31)(E). An affiliate, in turn, is defined, with some exceptions not relevant here, as an "entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor." 11 U.S.C. § 101(2)(A). In this case, Fulford, because he owned 25% of the Debtor, is an affiliate of the Debtor. SRH is an insider of Fulford because it is an LLC (which is treated as a corporation for these purposes) wholly owned by Fulford. *See* 11 U.S.C. § 101(31)(A) ("[I]f the debtor is an individual—[a] corporation of which the debtor is a director, officer, or person in control [is an insider]."); *see also Redmond v. CJD & Assocs., LLC (In re Brooke Corp.)*, 506 B.R. 560, 567 (Bankr. D. Kan. 2014) (holding that an LLC is included within the Code's definition of "corporation"). Therefore, as an insider of an affiliate, SRH is an insider of the Debtor. *See* 11 U.S.C. § 101(31)(E). SRH also is an insider under the Georgia Code, which contains a very similar definition. *See* O.C.G.A. § 18-2-71(8).

the recovery of fees "where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." O.C.G.A. § 13–6–11. Claims brought under this statute are not independent causes of action. *Sandy Springs Toyota v. Classic Cadillac Atlanta Corp.*, 269 Ga.App. 470, 604 S.E.2d 303, 306 (2004). They are meant merely as a supplement to any award on a plaintiff's other claims. *See Dept. of Transp. v. Fru–Con Constr. Corp.*, 206 Ga.App. 821, 426 S.E.2d 905, 909 (1992). Therefore, as the Trustee has not succeeded under either of the primary counts of his complaint, he is not entitled to an award of attorneys' fees.

## Conclusion

For the reasons set forth above, the Court finds that the Trustee is not entitled to judgment on any count of his complaint.[5] Therefore, the Court will enter judgment for the Defendants in accordance with this Order.

The Clerk is **DIRECTED** to serve this Order on the Trustee, SRH, Fulford, and respective counsel.

---

**5.** At the close of the Trustee's evidence at trial, the Defendants made motions under Rules 41 and 52 of the Federal Rules of Civil Procedure. At the time, the Court took those motions under advisement and the trial continued. As a result of the Court's decision in this Order, the Court concludes that those motions are moot.