In the

# United States Court of Appeals

### For the Seventh Circuit

_____

No. 15-2093

IN RE: GREAT LAKES QUICK LUBE LP,

*Debtor.*

_____

OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF GREAT
LAKES QUICK LUBE LP,

*Plaintiff-Appellant,*

*v.*

T.D. INVESTMENTS I, LLP,

*Defendant-Appellee.*

_____

Appeal from the United States Bankruptcy Court for the
Eastern District of Wisconsin.
No. 13-02709-SVK — **Susan V. Kelley**, *Bankruptcy Judge.*

_____

ARGUED DECEMBER 4, 2015 — DECIDED MARCH 11, 2016

_____

Before POSNER, FLAUM, and WILLIAMS, *Circuit Judges*.

POSNER, *Circuit Judge*. In 2012 a company named Great
Lakes Quick Lube LP (Great Lakes for short), which owned a

series of stores throughout the Midwest that provided oil changes and other automotive maintenance services, filed for bankruptcy under Chapter 11 of the Bankruptcy Code. The committee appointed to represent the unsecured creditors filed an adversary action (in effect a separate suit within the overall bankruptcy proceeding) against T.D. Investments I, LLP, which had leased two oil-change stores to Great Lakes. Great Lakes had negotiated the termination of the leases 52 days before it declared bankruptcy, and the creditors' committee contends that the termination was either a preferential or a fraudulent transfer of the leases to T.D. and that whichever it was the value of the leases belongs to the bankrupt estate and should therefore be available to the bankrupt's creditors.

T.D. denies that the terminations were transfers, let alone preferential or fraudulent, and the bankruptcy judge agreed but at the request of the creditors' committee asked us to accept a direct appeal from her ruling. See 28 U.S.C. § 158(d)(2)(A). We have accepted the appeal.

Before its bankruptcy Great Lakes had acquired more than a hundred store leases, typically by buying a store, selling it to investors, and leasing it from the new owners under a long-term contract. In February 2012, with its debts mounting and bankruptcy looming, Great Lakes agreed with T.D. to terminate the two leases that it had obtained from that company—even though the leased stores were profitable—plus leases which we can ignore on three unprofitable stores that it had obtained from affiliates of T.D. The creditors' committee contends that the transaction with T.D. was both a preferential and a fraudulent transfer. A preferential transfer, forbidden by 11 U.S.C. § 547(b), is, so far as relates to this

case, a transfer by an insolvent debtor to a favored creditor within 90 days before bankruptcy that gave that creditor more than if it had waited for the bankrupt's assets to be distributed in the bankruptcy proceeding. (T.D. was of course a creditor of Great Lakes.) The particular type of fraudulent transfer alleged by the creditors' committee—what is called a "constructive" fraudulent transfer, see 11 U.S.C. § 548(a)(1)(B)—is a transfer, made by an insolvent or nearly insolvent debtor to anyone (whether or not a creditor) within two years before the bankruptcy, that gave the debtor (and consequently the estate in bankruptcy) less than what he transferred. So far as relates to this case, there appears to be no difference between the two types of improper transfer.

The transfer alleged is the surrender by Great Lakes of the two leases that it had been granted by T.D. The parties disagree about whether Great Lakes received equivalent value for the leases that it surrendered and whether T.D. received more value as a result of the surrender than it would have received had the leases been part of the bankrupt estate. The bankruptcy judge did not resolve these issues because as we said she ruled that the terminations had not been transfers.

At trial, the head of Great Lakes, Jim Wheat, testified that the company had terminated the profitable leases for a variety of reasons including a strained relationship between Wheat and the head of T.D., John Theisen. According to Wheat, Theisen was demanding and inflexible, especially in insisting on prompt payment of Great Lakes' rental obligations despite its parlous financial state. Wheat testified that other reasons for his decision to terminate the leases were fear of eviction by T.D. and that having fallen behind in its

rental payments and other obligations Great Lakes had also to fear being sued by T.D.

It seems unlikely that Great Lakes terminated leases on two profitable stores just because the landlord was being difficult and making threats. But if Great Lakes knew it was going down the tubes it would have had no compelling reason to cling to the leases since if it did they would become assets of the estate in bankruptcy and thus property of Great Lakes' creditors; and either way the leases would have no value to Great Lakes. Conceivably, therefore, even slight irritation with Theisen might have led Great Lakes to terminate them.

The creditors' committee presented evidence that the two stores together were worth between $327,000 and $450,000 to Great Lakes, figures derived from projections of how well the stores were likely to have done before the leases expired. The value estimates would make little difference to Great Lakes if, to repeat, it knew it was going to lose the stores regardless, whether to T.D. or to its other creditors. But to the extent that the leases would have had comparable or at least significant value to creditors of the bankrupt estate, Great Lakes' surrender of the leases to T.D. could be regarded as a preferential transfer.

T.D. argues that Great Lakes decided to terminate the leases in order "to rid itself of locations that were burdensome to its operations with the hopes that such action would allow it to avoid bankruptcy and continue operating." Though discarding profitable locations could not stave off bankruptcy, T.D. argues that even though the two stores were profitable, ongoing maintenance, repairs, and other obligations would have cut so far into those profits that Great

Lakes would actually have lost money had it retained the leases.

Another possible explanation for the terminations builds on the fact that Great Lakes may have expected to emerge from bankruptcy as a going concern—Chapter 11 is oriented toward reorganization rather than liquidation. And while the bankruptcy proceeding will not end until this adversary action between Great Lakes' unsecured creditors and T.D. is resolved, Great Lakes has continued to operate its business, albeit in shrunken form—the number of stores it leased dropped from 107 at the company's peak to 64 shortly after the bankruptcy. Once reorganized, it would be struggling for survival with its diminished number of stores. Still, a fresh start may be easier for Great Lakes' management to obtain without its needing to deal with the irritating Theisen.

T.D. argues that the leases were abandoned rather than transferred, and if they were not transferred the creditors have no valid avoidance claims. But the Bankruptcy Code defines "transfer" broadly, as including "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with—(i) property; or (ii) *an interest in property*." 11 U.S.C. § 101(54)(D) (emphasis added). Great Lakes had an interest in property—namely the leaseholds—which it parted with by transferring that interest to T.D. That was a transfer to one creditor of what might have been an asset to Great Lakes' other creditors had the transfer not taken place; and if so it was a preferential transfer and therefore avoidable.

T.D. invokes another provision of the Bankruptcy Code—11 U.S.C. § 365(c)(3), which provides that "the trustee [in bankruptcy] may not assume or assign any … unexpired

lease of the debtor … if … such lease is of nonresidential real property and has been terminated under applicable non-bankruptcy law prior to the order for relief." The bankruptcy judge thought the quoted language describes this case. But if true this would place section 365(c)(3) on a collision course with section 101(54)(D), quoted in the preceding paragraph. For remember that the latter section covers not only property but also an *interest* in property, and a lease is an interest in property. Section 365(c) is aimed at facilitating the re-leasing of commercial property during bankruptcy proceedings by forbidding the trustee to interfere with the occupancy of the new tenants. See *Robinson v. Chicago Housing Authority*, 54 F.3d 316, 319 (7th Cir. 1995). It prohibits the trustee from "assum[ing] or assign[ing]" leases, as in selling a lease to someone who as lessee would be entitled to occupy the property. But Great Lakes' creditors don't want the leases; their actions for avoidance of the transfers of the leases (sections 547(b) and 548(a)(1)) and recovery of the leases' value (section 550(a)) do not require "assum[ing] or assign[ing]" the leases. Section 365(c)(3) is therefore inapplicable.

Upon the termination of Great Lakes' leases, T.D. leased the two stores to Super Lubes of Wisconsin, LLC, an oil-change company much like Great Lakes. If the bankruptcy court were to order the stores turned over to Great Lakes' creditors, this would have the disruptive effect on commercial activity against which section 365(c)(3) is aimed. But to repeat, the creditors are seeking not the leases but the *value* of the leases that Great Lakes transferred to T.D. They are not trying to evict anyone.

This distinction between the value of the leases (value to which the creditors may be entitled) and the leases them-

selves (which cannot lawfully be transferred to them) enables the purpose of section 365(c)(3) to be fulfilled without making inroads into section 101(54)(D). The bankruptcy judge's reading of 365(c)(3) placed the two sections in needless conflict.

The judgment of the bankruptcy court is reversed and the case remanded to that court to determine the value of Great Lakes' transfer to T.D. and whether T.D. has any defenses to the creditors' claims.

Other issues are raised by the parties but do not warrant discussion.

REVERSED, AND REMANDED WITH DIRECTIONS