IN RE: Rocky Rene WHITE, Debtor.

Jason Pettie, as Chapter 7 Trustee For the Estate of Rocky Rene White, Plaintiff,

v.

Kevin Ringo and Shechem Industries, Inc., Defendants.

CASE NO. 14-65320-WLH
ADVERSARY PROCEEDING
NO. 15-05421-WLH

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

Signed October 24, 2016

Karen Scott Greene, Karen Scott Greene, PC, Lawrenceville, GA, for Debtor.

Jason L. Pettie, Decatur, GA, Terrence Shannon, Terrence Shannon, P.C., Porterdale, GA, for Plaintiff.

J. Michael Lamberth, Lamberth, Cifelli, Ellis & Nason, P.A., Hal Wright, Atlanta, GA, Robert Jackson Wilson, Robert Jackson Wilson, P.C., Lawrenceville, GA, for Defendants.

## ORDER ON SHECHEM'S MOTION FOR SUMMARY JUDGMENT ON THE REMAINING COUNTS AND RENEWED MOTION FOR SUMMARY JUDGMENT ON COUNT 9

Wendy L. Hagenau, U.S. Bankruptcy Court Judge

This matter is before the Court on Defendant Shechem Industries, Inc.'s Motion

for Summary Judgment on Remaining Counts ("Motion") (Docket No. 61) and Renewed Motion for Summary Judgment on Count 9 ("Renewed Motion") (Docket No. 78). The Court has jurisdiction over this proceeding under 28 U.S.C. §§ 157 and 1334 and the Plaintiff and Shechem have admitted this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(H).

## PROCEDURAL BACKGROUND

Debtor Rocky White ("Debtor") filed his voluntary petition under Chapter 7 of the Bankruptcy Code on August 5, 2014. Plaintiff Jason Pettie, as Chapter 7 trustee for the estate of Debtor ("Plaintiff"), filed this Adversary Proceeding on October 30, 2015 against Shechem Industries, Inc. ("Shechem") and Kevin Ringo ("Ringo") ("Complaint"). In the Complaint, Plaintiff sought to avoid Debtor's transfer of his interest in certain business entities and real property, and sought the payment of a two million dollar debt allegedly owed to Debtor by Shechem. The Complaint alleges the debt should be paid under the theories of turnover, open account and unjust enrichment.

Shechem filed a Motion for Partial Summary Judgment on June 6, 2016 seeking summary judgment on Counts 7, 8 and 9 of the Complaint, which are the claims for turnover, open account and unjust enrichment, respectively (Docket No. 42). The Court ruled that summary judgment was appropriate on the claims for turnover and open account, but held there was insufficient evidence to rule on the claim for unjust enrichment (Docket No. 66). Prior to that ruling, Shechem filed the Motion, seeking summary judgment on Counts 4, 5 and 6, arguing that Plaintiff cannot prove Debtor fraudulently transferred certain real property. On September 14, 2016 Shechem filed the Renewed Motion seeking summary judgment on Count 9, arguing that a claim for unjust enrichment cannot lie where there is a contract between the parties and that Shechem was not unjustly enriched through the termination of the lease agreement (Docket No. 78).

## UNDISPUTED FACTS

Plaintiff labels only a few "facts" as disputed; however, the material facts themselves are not disputed. What is disputed is the parties' interpretation of the agreements involved in this case and the legal conclusions derived therefrom. The Court finds the following facts are undisputed.

The Debtor was involved in the development of a technology to treat wastewater which is referred to by the parties as the NJUN System. Joe Forrester ("Forrester") had experience in product manufacturing and had an interest in learning about wastewater treatment technology. Through his acquaintance with Keith Moore, Forrester became aware that Ringo was involved with the NJUN System. After being exposed to the NJUN System, Forrester formed Shechem with the intention of monetizing the value of the NJUN System. On December 22, 2009, Shechem and NJUN-One LLC ("NJUN-One") entered into a contract that granted Shechem rights to install NJUN Systems throughout the state of Georgia for a fee of $600,000.

By the spring of 2010, Shechem had made its last payment under the agreement with NJUN-One. However, the NJUN System was not yet ready for market. The NJUN System needed additional development, and regulatory approval still needed to be obtained. Ringo requested additional funds, and further negotiations took place between Shechem, Ringo and NJUN-Southeast ("NJUN-SE"). On June 3, 2010, Shechem negotiated a second agreement with NJUN-SE and Ringo that provided Shechem with the right to supply

products associated with the NJUN System throughout six other states in the southeast ("Six States Agreement"). In exchange for the right to supply these products, Shechem was to pay NJUN-SE a territory fee of $30,000,000 ("Territory Fee"). The Territory Fee would be paid in part in monthly installments. For the first year, the payments were at least $50,000 per month, and thereafter the payments were based on monthly sales.

The Territory Fee could be partially satisfied by a transaction involving real property located at 1390 Hillside Drive, Grayson, Georgia ("Hillside Property"). Shechem purchased the Hillside Property for $789,000, leased the property "to [Debtor] at the express direction of NJUN-SE", and was to eventually deed the Hillside Property to Debtor when the mortgage was paid. The Six States Agreement provided that Shechem had obtained a mortgage "in connection with the purchase of the property" and that Shechem "shall be responsible for satisfying the terms of the [mortgage] in full". Under the Six States Agreement, Shechem could retain $250 of each monthly payment based on sales to pay toward the mortgage. The Six States Agreement also provided that Shechem "shall transfer ownership of the property to [Debtor] within sixty (60) days of the [mortgage] having been satisfied in full", at which time Shechem would be entitled to a $2,000,000 credit toward the Territory Fee Shechem owed NJUN-SE.

On June 3, 2010, Shechem and Debtor entered into a lease, providing that Debtor would live in the Hillside Property rent free while Shechem paid the mortgage on the property ("Lease Agreement"). Neither the Six States Agreement nor the Lease Agreement contain any set period of time during which the loan had to be paid off. The record includes no information as to the term of the initial loan, but the Lease Agreement contemplates the loan could be renewed, extended or modified, and provides Debtor with no control or veto power over such renewal, extension or modification. Debtor would pay taxes, insurance, any homeowner association fees and all utilities on the Hillside Property during the term of the lease. Debtor was also responsible for maintenance of the Hillside Property. The Lease Agreement provided no basis for termination by the tenant and it could not be terminated by the landlord upon default. Termination of the lease was only permitted if "Landlord fails as a business (where 'fails as a business' is determined by Landlord's inability to pay its debts as they become due) prior to the (i) expiration or (ii) earlier termination of this Lease by consent of both Landlord and Tenant." Additionally, the Lease Agreement could not be assigned or sublet without Shechem's consent, but such consent was not to be unreasonably withheld.

Debtor never resided at the Hillside Property. He failed to pay ad valorem taxes in the amount of $30,599.84 and insurance of $23,800.67 on the Hillside Property during the pendency of the Lease Agreement, but he did spend money on improvements to the house and his brother Rudy White lived there for a period of time. Debtor was unable to pay the estimated $21,000 a year for taxes and insurance and struggled to keep up with the utility payments with five HVAC units in the house.

On June 15, 2012, Robbie White, Debtor's brother, obtained a judgment against Debtor in the amount of $162,074.72 for funds due dating back to 2001.

On November 5, 2012, Shechem recorded a security deed on the Hillside Property securing a debt of $582,530.

By 2013, no products had been sold under the Six States Agreement. On June 14,

2013 Shechem entered into a Patent License Agreement ("PLA") with NJUN, LLC, NJUN Holding, LLC, NJUN-One, NJUN-SE and Ringo. Under the PLA, Shechem was granted the right to sell and use licensed NJUN products in the same territory laid out in the Six States Agreement. The PLA stated expressly it was intended to supersede the Six States Agreement. The PLA also required Shechem to pay a percentage of its net revenue as royalties to NJUN-SE.

On the same day, NJUN, LLC, NJUN-SE, Ringo, Shechem and Debtor entered into an agreement terminating the Lease Agreement ("Lease Termination Agreement"). In addition to terminating the Lease Agreement, the Lease Termination Agreement provided for the payment of an "advance" from Shechem to NJUN-SE in the amount of $200,000. The initial $25,000 was paid upon signing the PLA. The balance of $175,000 would be paid after the mortgage on the Hillside Property was refinanced, but if refinancing did not occur, the parties agreed to negotiate "mutually agreeable terms for the SE-PLA and this TRANSACTION, but in any event, the LEASE termination survives any re-negotiation or termination of this TRANSACTION". The agreement called for the sale of the Hillside Property, with the proceeds being used to satisfy the mortgage (including the referenced advance), reimburse Shechem and NJUN-SE for all expenditures on the house, and reimburse Shechem for property taxes and insurance.

Any excess cash would then be paid to NJUN-SE.

On December 23, 2013, Shechem recorded a security deed on the Hillside Property securing a debt of $750,000.[1]

On December 27, 2013, the same parties entered into a Revised Lease Termination Agreement ("Revised Agreement") that acknowledged the termination of the Lease Agreement for the Hillside Property. The Revised Agreement called for the payment of the balance of the $200,000 advance required by the Lease Termination Agreement, but no longer referred to the payment as an advance. It also called for an additional "guaranteed" payment of $250,000 from Shechem to NJUN-SE and provided that Shechem was not required to pay royalties under the PLA unless royalties exceeded $50,000. The Revised Agreement continued to provide for the sale of the Hillside Property, but any proceeds of the sale belonged to Shechem so long as the guaranteed payment was made. The Revised Agreement expressly stated it superseded the previous Lease Termination Agreement while affirming that the Lease Agreement was terminated as of June 14, 2013.

During the period the Lease Agreement was in effect, portions of the Hillside Property fell into disrepair. Following the termination of the Lease Agreement, Shechem spent $149,284 repairing the Hillside Property.[2] Debtor never paid the past due

---

1. The only evidence in the record of the security deeds recorded on November 5, 2012 and December 23, 2013 is the first page of each deed, neither of which has been authenticated. Without proper authentication, the deeds would not be admissible as evidence at trial, and therefore should not be relied on at the summary judgment stage. See Snover v. City of Starke, 398 Fed.Appx. 445, 449 (11th Cir. 2010) (citing Rowell v. BellSouth Corp., 433 F.3d 794, 800 (11th Cir. 2005)). However, because Shechem has not objected to Plain-

tiff's use of the security deeds in their present form, they will be considered for purposes of this Order.

2. In Plaintiff's Response to Statement of Undisputed Facts (Docket No. 73), Plaintiff stated that this fact was undisputed. Later, in Plaintiff's Response to Statement of Undisputed Facts filed in response to the Renewed Motion (Docket No. 83), Plaintiff disputed this fact, arguing that Shechem billed NJUN for the expenses and took offsets on the pay-

taxes, insurance and other costs. The property was sold in August 2015 to an unrelated third party for a purchase price of $985,000, with a $31,000 reserve for further repairs.

Throughout this time period, Shechem struggled as a business. It was set up to monetize the NJUN System. Shechem tried at least three different ways to make money from the NJUN technology (installation, supply and sale, and use), but no money was generated. No sales of the NJUN technology were made under any of the agreements despite the fact Shechem paid NJUN-One and NJUN-SE well over $1 million. Shechem had no material operating income. Its funding came from capital contributions or loans. Shechem continues in business, testing its version of the wastewater technology.

## LEGAL CONCLUSIONS

### Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law". Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056(c). "The substantive law [applicable to the case] will identify which facts are material." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248, 106 S.Ct. 2505.

The party moving for summary judgment has "the initial responsibility of informing the...court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any' which it believes demonstrate the absence of a genuine issue of material fact." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (citing Celotex Corp., 477 U.S. at 323, 106 S.Ct. at 2553). What is required of the moving party, however, varies depending on whether the moving party has the ultimate burden of proof on the issue at trial.

> When the nonmoving party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material negating the opponent's claim' (cites omitted) in order to discharge this 'initial responsibility'. Instead, the moving party simply may 'show—that is, point out to the...court—that there is an absence of evidence to support the nonmoving party's case. (cites omitted). Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial.

Four Parcels of Real Prop., 941 F.2d at 1437 (citing Celotex, 477 U.S. at 323–31, 106 S.Ct. 2548).

Once this burden is met, the nonmoving party cannot merely rely on allegations or denials in its own pleadings. Fed. R. Civ. P. 56(e). Rather, the nonmoving party must present specific facts that demonstrate there is a genuine dispute over material facts. Hairston v. Gainesville Sun Pub. Co., 9 F.3d 913, 918 (11th Cir. 1993).

ments. However, Plaintiff did not cite any evidence in the record and the Court has been unable to locate any support for this state-

ment. Thus, the Court views the fact as admitted by Plaintiff in Docket No. 73 and is undisputed for purposes of this Order.

When reviewing a motion for summary judgment, a court must examine the evidence in the light most favorable to the nonmoving party and all reasonable doubts and inferences should be resolved in favor of the nonmoving party. Id. Here, the Plaintiff has the burden of proving each element of a fraudulent conveyance by a preponderance of the evidence. In re Fruehauf Trailer Corp., 444 F.3d 203, 211 (3d Cir. 2006). The Plaintiff has the burden of pointing the Court to specific facts that demonstrate a genuine issue of fact.

### Avoidance of Transfer Pursuant to 11 U.S.C. § 548(a)(1)[3]

Shechem seeks summary judgment on Counts 4, 5 and 6 of the Complaint.[4] In Counts 4 and 5 of the Complaint, Plaintiff alleges the termination of the Lease Agreement constituted a fraudulent transfer of Debtor's interest in the Hillside Property under Sections 548(a)(1)(A) and (B) of the Bankruptcy Code, respectively. The relevant provisions of Section 548(a) provide:

(a)(1) The trustee may avoid any transfer...of an interest of the debtor in property...that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer...with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made..., indebted; or

(B)(i) received less than a reasonably equivalent value in exchange for such transfer...; and

(ii)(I) was insolvent on the date that such transfer was made..., or became insolvent as a result of such transfer; [or]

. . .

(III) intended to incur, or believed that the debtor would incur, debts that were beyond the debtor's ability to pay as such debts matured

■ The first step of a fraudulent transfer analysis is for the court to determine whether there was a transfer of a property interest of the debtor. See Wallace v. McFarland (In re McFarland), 619 Fed. Appx. 962, 967 (11th Cir. 2015) (determining that there was a transfer of an interest is the "threshold issue" in a fraudulent conveyance inquiry); see also Thompson v. Doctor's Assocs., Inc. (In re Thompson), 186 B.R. 301, 307 (Bankr. N.D. Ga. 1995). If the court determines that there has been a "transfer of an interest of the debtor in property", then it must decide whether the transfer was actually or constructively fraudulent under Section 548(a). Id.

### Rocky White's Interest in the Hillside Property

■ Shechem first argues that it is entitled to summary judgment on both fraudulent conveyance counts because Debtor did not have a cognizable interest in the Hillside Property within the meaning of Section 548(a). A debtor's bankruptcy estate includes "all legal or equitable

---

**3.** Plaintiff's response to Shechem's Motion references only O.C.G.A. § 18–2–74, the Georgia fraudulent conveyance statute. Plaintiff's complaint does not plead a claim under O.C.G.A § 18–2–74, but only 11 U.S.C. § 548. The Court will therefore only apply Section 548 in this analysis.

**4.** Count 6 of the Complaint seeks the recovery of fraudulently transferred property under 11 U.S.C. § 550. Shechem seeks summary judgment on this claim on the basis that it is entitled to summary judgment on the claims under Sections 548(a)(1)(A) and (B), and that therefore there is no fraudulently transferred property to recover.

interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). "The nature of a debtor's interest in property under [Section] 541 is determined by state law." In re McFarland, 619 Fed.Appx. at 968 (citing Musolino v. Sinnreich (In re Sinnreich), 391 F.3d 1295, 1297 (11th Cir. 2004)).

■ Under the Lease Agreement, Debtor had two separate interests in the Hillside Property: the right to possess the property during the term of the lease, and the future, contingent right to own the property free and clear of mortgages. In Georgia, a landlord-tenant relationship is created when "the owner of real estate grants to another person...the right simply to possess and enjoy the use of such real estate either for a fixed time or at the will of the grantor." O.C.G.A. § 44–7–1(a); see also Jekyll Development Assoc., L.P. v. Glynn Cty. Bd. of Tax Assessors, 240 Ga. App. 273, 274, 523 S.E.2d 370 (1999). In conveying a leasehold interest, the landlord fully parts with possession and the right of possession, which then passes to the tenant. That possessory interest has been recognized as a property right in Georgia. See Franco's Pizza & Delicatessen, Inc. v. Dept. of Transp., 178 Ga.App. 331, 331–32, 343 S.E.2d 123 (1986) (finding a leasehold to be a property right sufficient to protect from public taking without just and adequate compensation); see also Waters v. DeKalb Cty., 208 Ga. 741, 745(1), 69 S.E.2d 274 (1952) ("[A] tenant, although he has no estate in the land, is the owner of its use for the term of his rent contract....").

The Six States Agreement and the Lease Agreement both state that Shechem was the owner of the Hillside Property and Debtor was the tenant. The Lease Agreement clearly granted Debtor a possessory interest in the Hillside Property. Shechem argues that Debtor's interest in the prop-erty is not cognizable because Debtor repeatedly breached his obligations under the Lease Agreement and was not in a position to cure the defaults such that he could retain his interest in the property. In its reply to Plaintiff's response to the Motion, Shechem argues that because of the deficiencies, there was no realistic possibility the estate would assume the Lease Agreement, and therefore Debtor had no interest in the property. While Plaintiff does not dispute Debtor failed to pay the ad valorem taxes and insurance on the Hillside Property during the pendency of the Lease Agreement, such breaches do not eliminate the possessory interest held at the time of termination. Importantly, the Lease Agreement specifically provided that it could not be terminated due to Debtor's default. Thus, any breach by Debtor did not terminate his possessory interest in the property. Furthermore, the financial ability of Debtor's estate to assume the Lease Agreement is simply not relevant to determining the existence of an interest in property (as opposed to its value). By entering into the Lease Agreement, Shechem granted Debtor the right to possess the Hillside Property, and he retained that interest until the lease was terminated. Therefore, the Court finds Debtor had a cognizable possessory interest in the Hillside Property at the time of the termination of the Lease Agreement.

■ In addition to a present possessory interest, the Debtor held a contingent future right to obtain title to the Hillside Property. Under the broad language of Section 541, "the term 'property' has been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed." Segal v. Rochelle, 382 U.S. 375, 379, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966); see also In re Nalley, 507 B.R. 411, 417 (Bankr. S.D. Ga. 2014). The definition

of property of the bankruptcy estate set forth in Section 541 ensures that "every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative" is placed within the custody of the bankruptcy court. In re Yonikus, 996 F.2d 866, 869 (7th Cir. 1993), abrogated on other grounds by Law v. Siegel, —— U.S. ——, 134 S.Ct. 1188, 1195, 188 L.Ed.2d 146 (2014); see also In re Elrod, 91 B.R. 187, 189 (Bankr. M.D. Ga.1988). "[T]he mere 'opportunity' to receive an economic benefit in the future is property with value under the Bankruptcy Code." In re Fruehauf Trailer Corp., 444 F.3d at 211 (cites omitted).

Both the Lease Agreement and the Six States Agreement required Shechem to transfer the Hillside Property to Debtor free and clear of all encumbrances once Shechem paid the mortgage on the property in full. Under the Six States Agreement, paragraph 4.4.1, Shechem alone was "responsible for satisfying the terms of the Loan [secured by the Hillside Property] in full". While paragraph 4.4.4 provides that $250 of the Unit Fee payable by Shechem to NJUN-SE "shall be allocated toward repayment of the Loan", this paragraph does not limit Shechem's obligation to pay the loan based on sales alone. Moreover, the Lease Agreement could only be unilaterally terminated by Shechem if its business failed, which was defined as Shechem being unable to pay its debts as they came due. Absent the defined business failure, Shechem had an absolute obligation to pay the loan on the Hillside Property in full at some future time. Thus, Debtor's contingent future right to ownership was a property interest.

*Transfer of Rocky White's Interest in the Hillside Property*

 Shechem next argues that summary judgment is warranted because Plaintiff cannot prove there was a transfer of an interest in property of the Debtor. The term "transfer" is broadly defined in the Code and includes "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with...property; or...an interest in property." 11 U.S.C. § 101(54)(D); see also In re Levine, 134 F.3d 1046, 1049 (11th Cir. 1998); Altman v. Underwood (In re Underwood), 2009 WL 5821030, at *6 (Bankr. M.D. Fla. 2009) ("The definition of transfer is as broad as possible....") (citation omitted). Debtor obtained a possessory interest in and a contingent future right to ownership of the Hillside Property when he entered into the Lease Agreement with Shechem. Upon termination, "a tenant[ ]...loses the right to possession and the [lessor] gains something that he did not have before, to wit: the right to reenter upon the premises immediately and take possession." In re Thompson, 186 B.R. at 307. In other words, where a lessee has a clearly identifiable possessory interest under a lease, the termination of the lease results in a transfer of the lessee's interest back to the lessor. The same is true for Debtor's contingent future right to ownership. Therefore, the termination of the Lease Agreement resulted in a transfer of an interest in property of Debtor. Id. ("The right of possession...is a property right and the involuntary transfer of same constitutes a transfer of an interest in property as described in Section 101(54)."); Official Comm. of Unsecured Creditors of Great Lakes Quick Lube LP v. T.D. Invs. I, LLP (In re Great Lakes Quick Lube LP), 816 F.3d 482, 485 (7th Cir. 2016) ("[The debtor] had an interest in property—namely the leaseholds—which it parted with by transferring that interest to [the defendant]."); Eder v. Queen City Grain, Inc. (In re Queen City Grain, Inc.), 51 B.R. 722, 726 (Bankr. S.D. Ohio 1985) ("There is just no getting away from the fact that upon the termination of [the debt-

or's] lease, there was a 'parting with...an interest in property', for after the termination of the lease [the debtor] no longer had an interest in [the property].").

Shechem argues that, as a policy matter, a valid lease termination should not be a basis for a fraudulent conveyance claim. Courts are divided over this proposition. Many courts have held that when a lease is terminated, the result is a transfer of rights sufficient to support a fraudulent conveyance claim. See In re Thompson, 186 B.R. at 307; ECB I, Inc. v. America Online, Inc. (In re ECB I, Inc.), 356 B.R. 631, 637 (Bankr. D. Del. 2006); In re Great Lakes Quick Lube LP, 816 F.3d at 485; Fitzgerald v. Cheverie (In re Edward Harvey Co.), 68 B.R. 851, 858 (Bankr. D. Mass 1987); In re Queen City Grain, Inc., 51 B.R. at 726; In re Indri, 126 B.R. 443, 446 (Bankr. D.N.J. 1991); Fashion Gallery, Inc. v. Finard (In re Fashion World, Inc.), 44 B.R. 754, 756 (Bankr. D. Mass. 1984).

Some courts have reached the conclusion there was no transfer of rights on the basis that the debtor did not have any cognizable property rights at the time of the transfer. See, e.g., Allan v. Archer Daniels Midland Co. (In re Commodity Merchs., Inc.), 538 F.2d 1260, 1263 (7th Cir. 1976); Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co. (In re Coast Cities Truck Sales, Inc.), 147 B.R. 674, 677-78 (D.N.J. 1992); Creditors' Comm. v. Jermoo's, Inc. (In re Jermoo's, Inc.), 38 B.R. 197, 205-06 (Bankr. W.D. Wisc. 1984). These cases are easily reconciled with those finding that a transfer occurred. In each instance, the issue is whether the debtor had a cognizable right at the time of termination. If so, the termination would constitute a transfer that could be fraudulent. In re ECB I, Inc., 356 B.R. at 637.

Still other courts have articulated policy concerns about finding a lease termination to be a transfer for the purpose of fraudu-

lent conveyance analysis. These cases argue that allowing recovery under Section 548 effectively revives a terminated lease which would "require[ ] an overly broad application of [Sections] 547 and 548, [and] violate[ ] the express language of [Section] 365(c)(3). . . ." In re Egyptian Bros. Donut, Inc., 190 B.R. 26, 29 (Bankr. D.N.J. 1995) ; see also In re Jermoo's, 38 B.R. at 204; In re 421 Willow Corp., 2003 WL 22318022, at *4–6 (E.D. Pa. Oct. 9, 2003). Permitting this conflict, the cases continue, would result in uncertainty surrounding validly terminated contracts and leases, which would have an adverse effect on commerce. In other words, these courts are concerned about debtors using Section 548 to circumvent Section 365(c)(3) to revive a validly terminated contract or lease.

The response to this concern is that the language of Section 365(c)(3) is irrelevant in a fraudulent conveyance analysis. See In re Edward Harvey Co., 68 B.R. at 859 ("[S]ection 365(c)(3) is simply not applicable where, as here, the lease was terminated in a constructively fraudulent manner."); In re EBC I, Inc., 356 B.R. at 638 ("[T]here is no language in section 548 to suggest that executory contracts or terminated contracts are not subject to its provisions."). Recovery of an interest under Section 548 does not necessarily implicate assumption or assignment under Section 365. See In re Great Lakes Quick Lube LP, 816 F.3d at 485–86.

Shechem asks the Court to conclude that, as a matter of law, allowing a lease termination to constitute a transfer for fraudulent conveyance analysis is incompatible with other provisions of the Code. The Court declines to do so, particularly on the facts of this case. The cases cited by Shechem all deal with the possible revival of leases that had been non-collusively and involuntarily terminated. Here, the termination of the Lease Agreement

was voluntary and occurred with the consent of all the parties. Though the parties argue the true motive behind termination, the Lease Agreement was nonetheless terminated by party agreement. Therefore, the present case is not similar to those cases where a lease or contract is terminated due to a material default, and the defaulting party attempts to use bankruptcy proceedings to revive the contract. "The essence of a transfer is the relinquishment of a valuable property right." In re Commodity Merchants, Inc., 538 F.2d at 1263. Debtor was granted a possessory interest and a contingent right to ownership in the Hillside Property when he entered the lease, and subsequently voluntarily relinquished those interests when the Lease Agreement was terminated. Therefore, the Court finds there was a transfer of an interest of the debtor in property.

## Constructive Fraud under Section 548(a)(1)(B)

Section 548(a)(1)(B) provides in relevant part that the trustee may avoid a transfer made within two years of the petition date if the debtor voluntarily or involuntarily "received less than a reasonably equivalent value in exchange for such transfer...and...was insolvent on the date that such transfer was made...or became insolvent as a result of such transfer...or...intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured...." 11 U.S.C. § 548(a)(1)(B).[5]

 To determine whether a debtor received "reasonably equivalent value", a court must address two distinct inquiries: whether value was received and whether

the value received is reasonably equivalent to the value of the property transferred. It is important to analyze each concept separately and not conflate them. Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors (In re R.M.L., Inc.), 92 F.3d 139, 149 (3d Cir. 1996). The burden of proving a lack of reasonably equivalent value is on the Plaintiff. PSN Liquidating Trust v. Intelsat Corp. (In re PSN USA, Inc.), 615 Fed.Appx. 925, 928 (11th Cir. 2015).

 The first question is whether Debtor received value for the termination of the Lease Agreement. Under Section 548 the term "value" includes "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor...." 11 U.S.C. § 548(d)(2)(A). "Courts generally construe the term 'value' broadly for purposes of the Bankruptcy Code." In re PSN USA, Inc., 615 Fed. Appx. at 930. The Eleventh Circuit has rejected a limited definition of value and instead held that value is something that "confers an economic benefit upon the debtor either directly or indirectly." Id.; see also Pummill v. Greensfelder, Hemker & Gale (In re Richards & Conover Steel, Co.), 267 B.R. 602, 612 (8th Cir. BAP 2001). A determination of whether value is received focuses "on the value of the goods and services provided rather than on the impact that the goods and services had on the bankrupt enterprise." In re PSN USA, Inc., 615 Fed.Appx. at 932.

 Here, it is undisputed that Debtor received value in exchange for signing the Lease Termination Agreement. Under the Lease Agreement, Debtor was responsible

---

5. The parties have not raised arguments regarding the insolvency of Debtor or whether Debtor was rendered insolvent by the transfer for the purpose of a constructively fraudulent

conveyance. Therefore, the analysis of Section 548(a)(1)(B) will be limited to a determination of "reasonably equivalent value".

for paying property taxes, insurance, utilities and general maintenance for the Hillside Property. This obligation continued throughout the term of the lease and Debtor could not unilaterally terminate the Lease Agreement to avoid the obligation. At the time of termination, Debtor owed $30,599.85 for taxes and $23,800.67 for insurance. After Debtor vacated the premises, Shechem spent $149,284 to repair the Hillside Property. Debtor was therefore liable for $203,684.52, and his liability would have continued to grow if he remained in possession of the property. Lease Agreement ¶ 7, 8, 9. Debtor stated that he was unable to pay the substantial property taxes and insurance on the property, which he estimated to be approximately $21,000 per year altogether, and that he struggled to keep up with the utility payments with five HVAC units in the house and other maintenance costs. Even though the Lease Agreement could not be terminated as a result of Debtor's defaults, Shechem retained all other remedies, Lease Agreement ¶ 14, which included the option to sue the tenant. See Swim Dixie Pool Corp. v. Kraemer, 157 Ga.App. 748, 278 S.E.2d 448 (1981); Maolud v. Keller, 157 Ga.App. 430, 278 S.E.2d 80 (1981). As part of the termination of the Lease Agreement, Shechem did not collect these liabilities from Debtor and the Lease Termination Agreement contemplated Shechem or NJUN would be repaid from the sale of the Hillside Property. Because the definition of "value" under Section 548 includes satisfaction of debt, the Court finds Debtor received value of over $200,000 in exchange for the transfer, plus the elimination of Debtor's future obligations of at least $21,000 a year.[6]

The next question is whether that value is reasonably equivalent to the value of the property interests transferred: both the possessory interest and the future contingent right to ownership. "If a court determines the debtor gained at least some value as a result of the transfer, what follows is a comparison: whether the debtor got roughly the value it gave." Fruehauf, 444 F.3d at 212–13 (cites omitted). The Bankruptcy Code does not define "reasonably equivalent value"; instead Congress left to the courts the obligation of marking the scope and meaning of "reasonably equivalent value". In re R.M.L., Inc., 92 F.3d at 148. "The concept of reasonably equivalent value is a means of determining if the debtor received a fair exchange in the marketplace for the goods transferred." In re Richards & Conover Steel, Co., 267 B.R. at 612 (citing Jacoway v. Anderson, 850 F.2d 342, 344–45 (8th Cir. 1988). The totality of the circumstances is used in determining whether value is reasonably equivalent. In re R.M.L., Inc., 92 F.3d at 148–49. In any event, reasonably equivalent value "does not require a dollar-for-dollar transaction." In re PSN USA, Inc., 615 Fed.Appx. at 931. The operative time for determining reasonably equivalent value is when the value was exchanged. Id. at 932.

---

**6.** Plaintiff argues without citing the Court to any evidence that Shechem did not actually pay the insurance, taxes or repair costs. Since there is no evidence in the record to support this argument, the Court rejects it. Even if the Court were to accept this argument as true, it would not change the analysis. The fact remains that the Debtor did not pay the expenses for which he was liable, and as a result of the lease termination, he avoided paying the past due expenses and future expenses. The Debtor therefore received the benefit from the transfer. See Northern Merchandise v. Brown (In re Northern Merchandise), 371 F.3d 1056 (9th Cir. 2004) ("reasonably equivalent value can come from one other than the recipient of the payments" (cite omitted)). The primary focus is "on the debtor's estate and the funds available to unsecured creditors." Id. at 1059. See also In re PSN USA, Inc., 615 Fed.Appx. at 928.

In order to determine if the over $200,000 in debt satisfaction and elimination of future obligations is "reasonably equivalent" to the rights transferred, some valuation of those rights must be made. As with all elements of the cause of action, the burden is on the Plaintiff to establish that value by a preponderance of the evidence. On a motion for summary judgment, the non-moving party with the burden of proof at trial must provide evidence that would support a verdict in Plaintiff's favor. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." Anderson v. Liberty Lobby, Inc., 477 U.S. at 252, 106 S.Ct. 2505. Here, the Plaintiff has failed to provide evidence in the record of the value of the interests transferred such that a conclusion could be reached that the value received by Debtor was not reasonably equivalent.

First, consider the future contingent right to own the Hillside Property, free of encumbrances. Debtor had the right to obtain title to the property once "the mortgage obtained in connection with the purchase of the Property by Landlord and all renewals, extensions and modifications thereof, have been satisfied in full", Lease Agreement ¶ 1, unless the lease was terminated earlier. Neither the Lease Agreement nor the Six States Agreement contains any set period of time during which the loan had to be paid off. The record includes no information as to the term of the initial loan, but the Lease Agreement contemplates the loan could be renewed, extended or modified, and provides Debtor with no control or veto power over such renewal, extension or modification. Under these arrangements, Shechem could rightfully renew and extend the loan to effectively negate Debtor's right to title indefinitely. So when, if ever, Debtor may obtain ownership of the Hillside Property is unknown.

Moreover, Debtor's right to title depended on the Lease Agreement not being terminated. The only unilateral ground on which Shechem could terminate the Lease Agreement was if its business failed, which the Lease Agreement defined as Shechem being unable to pay its debts as they came due. Bankruptcy courts construing similar language in the Bankruptcy Code have held that generally not paying debts as they come due requires the court to apply a totality of the circumstances or flexible test which takes into consideration the number of payments missed, the number of creditors unpaid and the amounts that are due. In re Smith, 243 B.R. 169, 189–90 (Bankr. N.D. Ga. 1999); In re Green Hills Development Company, 445 B.R. 647, 657 (Bankr. S.D. Miss. 2011). Plaintiff has directed the Court to no evidence that indicates Shechem was likely to avoid failing as a business. To the contrary, the evidence in the record is that Shechem never received any sums as a result of its arrangements with NJUN. The NJUN System was never sufficiently developed and did not have regulatory approval such that it could be manufactured and sold, thus Shechem never installed a single unit, sold product for NJUN or received any funds from it. Shechem was a startup business and has been dependent on loans and capital contributions to fund operations because it has been unable to make any sales. Shechem continued in business, at least through early this year, but still without making any sales. Therefore, the evidence in the record suggests there was a probability Shechem's business would fail which then affects the value of Debtor's interests.

The Court recognizes contingent interests have some value. Some courts evaluate whether the expectation of success was "legitimate and reasonable." Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 647 (3d Cir. 1991). Others state

there is some value "so long as there is some chance" that a venture will be successful. In re R.M.L., Inc., 92 F.3d at 152. But the amount of the value is directly correlated to the chance of receiving a benefit. Id. at 153. Where the chance of obtaining the benefit was "little, if any", the value was "minimal". Id. at 154. Here, the chance of Debtor receiving title to the Hillside Property was remote. The Lease Agreement could be terminated if Shechem failed as a business, and in the four years during which Shechem and NJUN transacted business not a single unit was sold under the various contracts to which it was party. Shechem did not generate any income and only operated on loans and capital contributions. Moreover, because there was no deadline for transferring ownership of the property and Shechem could indefinitely renew, extend or modify the loan, there was no absolute guarantee of ownership being transferred. Therefore, the Court concludes the value of the future contingent right to ownership was minimal. Plaintiff has provided no evidence to support its position that the more than $200,000 in debt satisfaction and elimination of future obligations the Debtor received was not reasonably equivalent to the value of the contingent interest.

The second property interest the Debtor transferred was the right to possess the house until the lease was terminated. Again, Plaintiff presented no evidence as to the value of that right. The Trustee in his deposition characterized the value as derived from the ability to rent the Hillside Property indefinitely. Shechem argues there was no rental value because assignment and subletting of the property was prohibited without Shechem's consent. The Lease Agreement provided, however, that Shechem could not unreasonably withhold its consent, so there is a chance Debtor would have been able to sub-lease the property for some amount of time. Never-

theless, the value of this chance to sublet the property is limited by the chance the Lease Agreement would be unilaterally terminated by Shechem due to its business failure as described above. While the Court concludes that Debtor's possessory interest had some value at the time of transfer, the Plaintiff has provided no evidence as to that value; no evidence of possible rents or any other value which would support a verdict for Plaintiff that the value provided the Debtor for the lease termination was not reasonably equivalent.

The burden is on the Plaintiff to show that the over $200,000 of direct quantifiable benefit to Debtor plus elimination of Debtor's remaining obligations under the Lease Agreement was not reasonably equivalent to the possessory interest and future contingent right to ownership of Debtor under the Lease Agreement. The Plaintiff has failed to carry his burden. Plaintiff's only argument is that Shechem paid $450,000 to NJUN-SE at the time the Lease Agreement was terminated, seeming to suggest this money should have been paid to Debtor instead. At the time the lease was terminated, Shechem was only obligated to provide a $200,000 advance to NJUN-SE. The additional $250,000 obligation did not arise until six months later, after Debtor's rights under the Lease Agreement had been terminated. But the Lease Termination Agreement was part of an overall termination of the Six States Agreement and a revision of Shechem's rights with NJUN-SE. The payment of funds to NJUN-SE was consistent with this change and does not suggest the funds were paid to terminate Debtor's rights or indicate a value of the Lease Agreement. The Lease Termination Agreement required that $25,000 of the advance be paid upon signing the PLA. The remaining $175,000 is also related to the PLA because paragraph 5 provides

that if the $175,000 could not be obtained through a refinance of the Hillside property, the parties would negotiate in good faith "mutually agreeable terms for the SE-PLA and this TRANSACTION, but in any event the LEASE termination survives any re-negotiation or termination of the TRANSACTION." In other words, the lease termination occurred regardless of the payment of the money. Therefore, the Court concludes Plaintiff did not carry his burden of proving that Debtor did not receive reasonably equivalent value for the execution of the Lease Termination Agreement. Summary judgment in favor of Shechem is appropriate for Count 5.

*Actual Fraud under Section 548(a)(1)(A)*

Plaintiff alleges the Lease Termination Agreement was executed by Debtor with the actual intent to hinder, delay or defraud creditors. Section 548(a)(1)(A) provides that the trustee may avoid a transfer made within two years of the petition date if the debtor voluntarily or involuntarily "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted." 11 U.S.C. § 548(a)(1)(A). Actual intent can be inferred through circumstantial evidence. In re XYZ Options, Inc., 154 F.3d 1262, 1271 (11th Cir. 1998). "In determining whether the circumstantial evidence supports an inference of fraudulent intent, courts should look to the existence of certain badges of fraud." Id. The badges of fraud include:

(1) The transfer was to an insider;

(2) The debtor retained possession or control of the property transferred after the transfer;

(3) The transfer was disclosed or concealed;

(4) Before the transfer was made the debtor had been sued or threatened with suit;

(5) The transfer was of substantially all the debtor's assets;

(6) The debtor absconded;

(7) The debtor removed or concealed assets;

(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred;

(9) The debtor was insolvent or became insolvent shortly after the transfer was made;

(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Id. When addressing the badges of fraud, courts will look to the totality of the circumstances. Id. at 1271. Showing only one badge of fraud "may be insufficient to establish intent, but a confluence of several can constitute conclusive evidence of an actual intent to defraud." In re LendXFinancial, LLC, 2012 WL 1597394, at *5 (Bankr. N.D. Ga. Mar. 19, 2012) (citations omitted).

Shechem argues it is entitled to summary judgment because Plaintiff cannot prove Debtor made the transfer with fraudulent intent. It is the Plaintiff's duty to point to evidence a fact finder could rely upon to determine fraudulent intent. See Kipperman v. Onex Corp., 2010 WL 761227, *4, 2010 U.S. Dist. LEXIS 18669, *12–16 (N.D. Ga. 2010). Specifically, Shechem argues the Lease Agreement was terminated because of the failure of the business venture between Shechem and the NJUN entities, and not for fraudulent

purposes. In response, Plaintiff argues that Debtor's ownership of the Hillside Property was not contingent on the success of the business venture, and that payments made by Shechem purportedly under other business agreements were actually paid for the lease termination. Plaintiff further asserts that a number of the above-listed badges of fraud are met by the lease termination, including that it resulted in a transfer of substantially all of Debtor's assets, that Debtor became insolvent shortly after the termination, and that Debtor received no consideration for the lease termination.

The Court concludes Plaintiff has not carried his burden of showing the Court evidence that would support a conclusion that the Debtor's execution of the Lease Termination Agreement was made with actual intent to hinder, delay or defraud creditors, including Robbie White. Importantly, it is the Debtor's intent that is relevant to the analysis, not the intent of Ringo, NJUN or Shechem in terminating the lease. The Hillside Property was not transferred to an insider and Debtor did not directly or indirectly retain possession or control of the property or any substitute property that was out of reach of creditors. The transfer was not concealed and Debtor did not abscond.

Debtor only agreed to a termination of a lease of property at which he did not live and where the ownership contingency was remote and of minimal value. The Court has already held Plaintiff did not present evidence that Debtor did not receive reasonably equivalent value for the termination of the lease. Plaintiff argues this lease termination was a transfer of substantially all Debtor's property which left him insolvent, but that is only because the Debtor had no property. This "badge" generally refers to a bulk transfer of substantial property, not a single residential lease

termination. Moreover, the Plaintiff provided no evidence that Debtor's obtaining the Lease Agreement had any effect on his solvency status. The Lease Agreement did not generate any cash for Debtor and therefore did not help him pay his debts as they came due. In fact, the evidence is to the contrary—the Lease Agreement cost Debtor money. Plaintiff also pointed to no evidence that the Lease Agreement impacted Debtor's solvency from a balance sheet perspective. Debtor did not own the Hillside Property, so its value was not an asset of Debtor. The Court notes Debtor's debt to Robbie White that existed since 2001 could not attach to this Hillside Property until the remote possibility Debtor became the owner occurred, so transferring that remote interest did not harm him or Debtor's solvency. In short, Plaintiff pointed the Court to no evidence Debtor's solvency status was affected by either obtaining the Lease Agreement or terminating it. There are no factors and no evidence to which Plaintiff has pointed the Court that support a conclusion Debtor actually intended to hinder, delay or defraud his creditors when he agreed to a termination of the Lease Agreement. Summary judgment in favor of Shechem is also warranted for Count 4.

*Recovery of Property under Section 550 and Good Faith Defense under Section 548(c)*

Because the Court has determined that the termination of the Lease Agreement was not a fraudulent transfer under 11 U.S.C. §§ 548(a)(1)(A) or (B), there is no need for the Court to conduct an analysis of recovery of property under Section 550 or Shechem's potential good faith defense under Section 548(c). Summary judgment in favor of Shechem for Count 6 of the Complaint is appropriate.

*Unjust Enrichment*

In the Renewed Motion, Shechem seeks summary judgment on Plaintiff's claim for unjust enrichment. Although Georgia law states that unjust enrichment is not available if there is a valid written contract between the parties, Ga. Dept. of Cmty. Health v. Data Inquiry, 313 Ga.App. 683, 687, 722 S.E.2d 403 (2012), Georgia law also permits a plaintiff to plead alternative theories of recovery, such that "if the factfinder concludes that [the defendant] did not breach any express contract, questions of fact would exist as to whether [the defendant] is liable under [the theory of unjust enrichment]." Campbell v. Ailion, 338 Ga.App. 382, 388, 790 S.E.2d 68 (2016). A claim for unjust enrichment exists "where a plaintiff asserts that the defendant induced or encouraged the plaintiff to provide something of value to the defendant, that the plaintiff provided a benefit to the defendant with the expectation that the defendant would be responsible for the cost thereof, and that the defendant knew of the benefit being bestowed upon it by the plaintiff and either affirmatively chose to accept the benefit or failed to reject it." Campbell, 338 Ga.App. at 387, 790 S.E.2d 68 (citing Crook v. Foster, 333 Ga.App. 36, 39, 775 S.E.2d 286 (2015)). "The concept of unjust enrichment in law is premised upon the principle that a party cannot induce, accept, or encourage another to furnish or render something of value to such party and avoid payment for the value received; otherwise the party has been unjustly enriched at the expense of another and, in fairness and good conscience, must reimburse the other to the extent of the value conferred." Crook v. Foster, 333 Ga.App. at 39, 775 S.E.2d 286 (citing Reidling v. Holcomb, 225 Ga. App. 229, 232 (2), 483 S.E.2d 624 (1997)).

In addressing Plaintiff's unjust enrichment claim in the previous summary judgment order (Docket No. 66), the Court did not have the benefit of the evidence and briefing on the nature of the interests transferred or the value provided by Shechem for them. Instead, the Court ruled on the narrow question of whether the existence of the Lease Agreement and Lease Termination Agreement meant the claim was one for breach of contract as opposed to unjust enrichment. Though the relationship between Debtor and Shechem was governed by contract (the Lease Agreement) and the termination was effected by multiple contracts (the Lease Termination Agreement and the Revised Agreement), the mutual and voluntary nature of the termination made it such that a breach of contract claim did not appear to exist, and a substantive analysis of unjust enrichment was therefore appropriate.

The Court now finds summary judgment is warranted in Shechem's favor on Plaintiff's unjust enrichment claim. In the Complaint, Plaintiff alleges that Shechem was unjustly enriched because Shechem received a $2,000,000 benefit under the Six States Agreement while Debtor failed to realize any benefit from the agreement—specifically, that he failed to receive the Hillside Property. The benefit Plaintiff refers to in the Complaint derives from paragraph 4.4.1 of the Six States Agreement, which stated that Shechem could take a $2,000,000 credit against the $30,000,000 Territory Fee owed under the agreement if Shechem purchased the Hillside Property for Debtor. However, paragraph 4.4.1 also provided that Shechem could only take the credit against the fee after the loan secured by the Hillside Property was paid in full and the property was transferred to Debtor. Plaintiff has failed to prove that Shechem was enriched under the Six States Agreement—it is un-

disputed that the $2,000,000 credit in question was never taken by Shechem. Moreover, to the extent Plaintiff is arguing that Shechem indirectly received a benefit under the Six States Agreement at the expense of Debtor (a non-party to the agreement), a claim for unjust enrichment does not lie because Georgia law does not support claims of unjust enrichment that arise from indirect benefits. See Peterson v. Aaron's, Inc., 2015 WL 5479877, at *1 (N.D. Ga. Sept. 16, 2015).

Plaintiff argues in his response that Shechem was unjustly enriched because it made over $300,000 in profit on the sale of the Hillside Property and that profit should inure to the benefit of Debtor. Plaintiff's argument is misplaced because it assumes that Debtor owned the Hillside Property and that what was transferred to Shechem was the full value of the Hillside Property. That is not correct. As stated above, the concept of unjust enrichment is that Shechem cannot accept something of value and avoid payment for the value received. What Shechem received by virtue of the Lease Termination Agreement was the relinquishment of Debtor's present possessory right in the Hillside Property and Debtor's future contingent right to ownership of the property. Debtor did not have a present ownership interest in the Hillside Property; Shechem did. The Court has ruled above that Shechem paid for the property interests transferred by Debtor to it, both in terms of the out-of-pocket costs and the termination of Debtor's ongoing obligations to Shechem which were in Debtor's estimation at least $21,000 a year. As with the fraudulent conveyance claim, the burden of proof on an unjust enrichment claim is that of the plaintiff. Once the defendant has presented evidence that it has made payment for the property transferred, the burden is on the plaintiff to point the Court to evidence in the record showing the amount paid was less than the value transferred such that the recipient of the transfer was enriched. Only then must the Court evaluate whether that enrichment was "unjust". Again, Plaintiff has failed to point the Court to evidence in the record as to the value of Debtor's rights transferred to Shechem. Thus, Plaintiff has failed to present the Court with any evidence that would support a conclusion that Shechem was unjustly enriched.

The evidentiary record is clear, though, that Debtor did not own the Hillside Property. Whatever the value of the rights transferred by Debtor to Shechem, it was less than the full value of the Hillside Property because Debtor held less than a full interest in the Hillside Property. Plaintiff's argument that Shechem made a profit upon the sale of the Hillside Property ignores this point. Furthermore, the "profit" which Plaintiff alleges was made by Shechem is wrongly calculated. The "evidence" to which Plaintiff points for the calculation is a security deed from November 5, 2012 for $582,530 (two years after the Hillside Property was purchased). Plaintiff suggests that Debtor could have obtained a similar mortgage so that when the Hillside Property was sold for $954,000 Debtor would have netted over $300,000 even after making repairs. Plaintiff's analysis contains several fallacies. First, the undisputed purchase price of the Hillside Property was $789,000, so there would be no "profit" for anyone until that was recovered. Second, there is zero evidence Debtor could have obtained a mortgage or even wanted one. Plaintiff relies on a provision in the Lease Agreement that Shechem would assist Debtor in assuming the existing mortgage in the event of lease termination. This provision is not a guaranty of Debtor obtaining a mortgage. Third, the sale price of the Hillside Property when compared to the undisputed costs of the

property show Shechem did not receive property for which it did not pay. The net sale price was $954,000. The original purchase price was $789,000, without including any interest accrued. Shechem spent $149,284 on improvements to the property. That leaves only $15,716 to cover any unpaid taxes and insurance.[7] So even if "profit" were the appropriate measure of unjust enrichment as Plaintiff contends, there was no "profit" on the sale before considering any additional interest or fees. These facts do not support a claim that Shechem was unjustly enriched.

Finally, Plaintiff argues Debtor should have been credited for the sums he paid for the repairs to the property and that Shechem refinanced the property to obtain $200,000 in benefit. Neither argument supports Plaintiff's unjust enrichment claim. The amount spent by Debtor to improve the property is captured in the value of the property evidenced by the sale to a third party. The $200,000 obtained by Shechem through refinancing in December 2013 was paid to NJUN as part of the Revised Agreement and in any event does not change the fact that Shechem paid $789,000 for the property at the outset and that is the appropriate number to use in determining "profit", if "profit" were relevant to the unjust enrichment claim.

The Court finds that Shechem was not unjustly enriched by the termination of the Lease Agreement. Therefore, summary judgment in Shechem's favor on Count 9 is appropriate.

## CONCLUSION

Based on the foregoing, it is hereby

**ORDERED** that Shechem's Motion is **GRANTED**;

**FURTHER ORDERED** that Shechem's Renewed Motion is **GRANTED.**

**IT IS ORDERED.**

---

**7.** Even assuming the taxes and insurance were paid by NJUN (of which there is no evidence) it is appropriate to consider them a cost of sale. Further the most Shechem benefited, excluding taxes and insurance, is $15,000, which is less than the value paid by Shechem of satisfaction of existing debt and future debt of at least $21,000 per year.